COMPAGNIE de REASSURANCE D'ILE de FRANCE, et al., Plaintiffs,

v.

NEW ENGLAND REINSURANCE CORPORATION, et al., Defendants.

Civ. A. No. 87–10027–H.

United States District Court, D. Massachusetts.

June 7, 1993.

372

William Shields, Day, Berry & Howard, Boston, MA, for plaintiffs.

Debra A. deBastos, Katz, Fanger & Greeley, Daniel J. Murphy, Murphy & deBastos, Boston, MA, for Universale Ruckversicherung, AG.

Hunter O'Hanian, Mitchell S. King, Rhonda L. Ritenberg, Sherri M. Rozansky, Anne–Marie Regan, Morrison, Mahoney & Miller, Suzanne Sheldon, Tedeschi, Grasso & Mortensen, David S. Mortensen, Tedeschi and Grasso, Suzanne Sheldon, Tedeschi, Grasso & Mortensen, Boston, MA, for New England Reinsurance Corp.

Hunter O'Hanian, Morrison, Mahoney & Miller, Suzanne Sheldon, Tedeschi, Grasso & Mortensen, Boston, MA, for First State Ins. Co.

Hunter O'Hanian, Morrison, Mahoney & Miller, Anne–Marie Regan, Tedeschi, Grasso & Mortensen, David S. Mortensen, Tedeschi

and Grasso, Boston, MA, for Cameron & Colby Co., Inc.

David S. Mortensen, Tedeschi and Grasso, Suzanne Sheldon, Tedeschi, Grasso & Mortensen, Boston, MA, for First State Ins. Co.

Suzanne Sheldon, Tedeschi, Grasso & Mortensen, Boston, MA, for Cameron & Colby Co., Inc.

Kristin G. McGurn, Day, Berry & Howard, Boston, MA, for Compagnie de Reassurance d'Ile de France.

## MEMORANDUM AND ORDER

## HARRINGTON, District Judge.

This is a case tried to a Judge sitting without a jury. Plaintiffs are 34 reinsurance syndicates, reinsurance companies and members of reinsurance pools,[1] which, from February 1, 1980 through 1983, entered into reinsurance Treaties (the "SANS Treaties") with Defendant New England Reinsurance Corporation (NERCO), the Reinsured under the Treaties. Some of the Plaintiffs entered into Treaties for each of the four years from 1980 to 1983. Others were parties to Treaties for one, two or three of the four years. For each year, there was a new contract.

"SANS" stands for "System and Non–System."

Defendants are a group of three affiliated companies within the Hartford Group of Insurance Companies. First State Insurance Company ("First State") wrote primarily excess and surplus lines of insurance. New England Reinsurance Corporation ("NERCO") wrote reinsurance. And, Cameron and Colby Co., Inc. ("Cameron and Colby"), provided management, marketing, underwriting, and other services to both First State and NERCO.

With the approval of the Hartford and ITT, Cameron and Colby established a division known as Graham Watson. The purpose of the Graham Watson division was twofold. First, Graham Watson was to participate in the property and casualty facultative reinsurance business which had traditionally been dominated by direct reinsurance writers. Second, it was to rationalize the facultative placements of both the Hartford and the First State, and to provide retrocessionaires with a broad cross section of facultative reinsurance emanating from those two companies.

Through the United States based insurance broker, G.L. Hodson & Son Inc. ("Hod-

---

1. The following Plaintiffs are Lloyds syndicates: (1) A.A. Cassidy & Others, (2) B.P.D. Kellet & Others, and (3) C.J. Warrilow & Others.

The following Plaintiffs are non-Lloyds reinsurance companies: (4) Compagnie de Reassurance d'Ile de France, (5) Group Josi Reinsurance Company S.A., (6) Hanseatica Ruckversicherungs Aktiengesellschaft, (7) Imperio Reinsurance Company (U.K.) Limited, (8) Uni–Polaris Forsikringsaksjelskap, (9) Sampo International Insurance Company Limited, (10) Societa Assicuratrice Industriale SPA, (11) Universale Ruckversicherungs Aktiengesellschaft, and (12) Terra Nova Insurance Company Limited.

The following Plaintiffs are members of the TGI Anstalt Pool: (13) Atlantica Insurance Company Limited, (14) De Centrale Herzverzekering N.V., (15) The General of Berne Insurance Company, (16) Kansa Reinsurance Company Limited, (17) Otso Loss of Profits Insurance Company Limited, (18) Samvirke Skadeforsikring A/S, (19) Transatlantica Reinsurance Company N.V., (20) RVS Schadeverzekering N.V., (21) Enterprise–Fennia Mutual Insurance Company, (22) Finnish Marine Insurance Company Limited, and (23)

WASA International Insurance Company Limited.

The following Plaintiffs are members of the Aurora Pool (later known as the English and American Pool): (24) English & American Insurance Company Limited, (25) City International Insurance Company Limited, (26) Fuji International Insurance Company Limited, (27) Lombard Continental PLC, (28) Nippon Insurance Company of Europe Limited, (29) Pohjola Insurance Company (U.K.) Limited, and (30) Kemper Reinsurance London Limited.

The following Plaintiffs are reinsurance companies which are also members of the TGI Anstalt pool: (31) Industrial Mutual Insurance Company, and (32) Pohjola Insurance Company.

(33) Kansa General International Insurance Company Limited is a member of the TGI Anstalt and the Vara Pooli pools, and (34) Tapiola International Insurance Company Limited is an insurance company which is a member of both the TGI Anstalt and Vara Pooli pools.

Plaintiffs Pohjola Insurance Company Ltd. and Pohjola Insurance Company (UK) Limited were dismissed on motion of the Defendants with the

son"), and various European sub-brokers,[2] NERCO, the original reinsurer, pursuant to the Treaties at issue in the instant case, ceded certain reinsurance business to the Plaintiff retrocessionaires. These cessions, the contractual terms which govern them, and representations allegedly made in connection with them, are the subject of this litigation.

Three documents are particularly relevant to a proper review and resolution of these issues. First, there is the Placing Information, which forms the basis for the initial negotiations between a cedent, like NERCO, and retrocessionaires, like the Plaintiffs. Second, there is the Slip, which constitutes, in an abbreviated form, the contract between the cedent and the retrocessionaires. And, finally, there is the "Treaty Wording," the formal contract, whose terms are consistent with the Slip and with any amendments thereto agreed upon subsequent to the Slip's being executed. It is often finalized months after the Slip has been signed.

In their complaint, Plaintiffs allege four claims against the Defendants. They allege that NERCO breached the terms of the SANS Treaties, and that, with the other Defendants, NERCO fraudulently induced Plaintiffs to enter into the SANS Treaties. In addition, Plaintiffs allege claims against all Defendants for violation of both ch. 93A, § 2, of the General Laws of the Commonwealth of Massachusetts and the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968 (1991) (RICO). Plaintiffs pray that the Court rescind the SANS Treaties, and seek a trebling of their damages, together with an award of their attorneys' fees incurred in prosecuting this action and of their experts' fees incurred in undertaking the inspection of NERCO's books and records, pursuant to Chapter 93A of the Massachusetts General Laws and RICO.

The Defendants deny the allegations of the Plaintiffs, and counterclaim for breach of contract, violation of Chapter 93A, and for reformation of the contract. They pray that

the Court declare the rights, obligations and liabilities of the parties under the SANS Treaties; award judgment in the amount currently owing under the terms of the SANS Treaties; issue an order that Plaintiffs pay any and all future claims pursuant to the terms of the SANS Treaties; issue an order that Plaintiffs comply with the letter of credit provisions of the SANS Treaties; award treble damages, costs and expenses pursuant to Chapter 93A of the Massachusetts General Laws; and reform the Special Surplus Treaties to conform with the agreements as stated in the Slips.

The Placing Information which European sub-brokers presented to the Plaintiff reinsurers on behalf of NERCO to persuade reinsurers to participate in the SANS Treaties typically contained the following information:

The Graham Watson division has recently been established by Cameron & Colby after a lengthy study of the facultative reinsurance operations in North America. This project has been discussed by Cameron & Colby with the Hartford and ITT, who have given their approval and support for this project.

The purpose of the Graham Watson division is twofold:

1. To participate in the property and casualty facultative reinsurance business which is currently dominated by the direct writers.

2. To rationalise the facultative placements of both the Hartford and the First State not only from an administration point of view but also to provide the retrocessionaires with a broad cross section of facultative reinsurance emanating from these two companies.

A recent analysis conducted by a leading reinsurance executive has indicated that out of a total facultative reinsurance premium, both property and casualty ceded by U.S. companies of approximately 1.5

---

consent of the Plaintiffs during the course of the trial.

**2.** The sub-brokers included: Sedgwick Payne (formerly Bland Payne); Anglo–Swiss Reinsur-

ance Brokers Ltd.; Carter Brito E Cunha Ltd.; Fielding & Partners; and Jardine Thompson Graham Ltd.

billion per annum, over 80% is non-brokered and placed significantly with the direct professional reinsurance market. Graham Watson is charged with the responsibility of penetrating this business, to be written in the New England Reinsurance Corporation. Facultative reinsurance emanating from reinsurance intermediaries will continue to be written separately through NERFAC.

It is not the intention that Graham Watson will seek facultative reinsurance on a wholesale basis from all and sundry but it is the intention that it shall develop a close working relationship with selected primary companies.

It is appreciated that it will take time to establish these relationships on a proper and sound basis and therefore in the meantime the majority of business will emanate from the "System" which is essentially the Hartford and First State.

The majority of this business is presently ceded to the direct writing reinsurers, and therefore the business underwritten by Graham Watson will be almost entirely business which has not and would not be available to the brokered reinsurance market.

It is not intended that Graham Watson will absorb all the facultative reinsurance requirements of either the Hartford or First State. However, it is the intention that the reinsurances to be arranged will receive a sufficient cross section of this business and will develop a mutually profitable relationship between New England Reinsurance Corporation and its retrocessionaires.

It is estimated that by the end of 1980 the premium on an annualized basis will be $20M divided approximately 60% casualty and 40% property. This does not take into consideration any Non–System business. The commission allowances proposed are not inconsistent with terms allowed in the facultative marketplace on subject matter business.

It should be noted that there is no profit commission on the casualty business, but on both property and casualty an allowance will be made at the end of each year on the earned premiums so that NERCO may share in the investment income.

A Slip, representative of that executed by the Plaintiff reinsurers and constituting the contract in its abbreviated form, contains, in pertinent part, the following terms:

\*     \*     \*     \*     \*     \*

TYPE PROPERTY AND CASUALTY SURPLUS TREATY

INTEREST Business classified by the Reassured as Property and Casualty Facultative Assumed business produced and underwritten by the Graham Watson division of Cameron & Colby Co., Inc.,

EXCLUSIONS: As per Schedules attached and/or to be agreed Leading Underwriter only.

TREATY DETAIL *SECTION A*—PROPERTY

Five (5) lines subject to a cession limit of $5,000,000 as respects any one risk.

The Reassured's minimum net retention hereunder shall be $250,000 as respects any one risk.

*SECTION B*—CASUALTY

Five (5) lines subject to a cession limit of $5,000,000 as respects any one risk.

As respects certificates which provide for an aggregate limit of liability and which attach during the currency of this Reinsurance, it is understood and agreed that all loss or losses subject to such aggregate limit occurring thereunder shall, for the purposes of this Reinsurance, be deemed to have occurred at the inception date of each certificate period. As used herein the term "certificate period" shall mean each aggregate period of a certificate which provides for aggregate limits of liability, not to exceed one (1) year plus odd time.

The Reassured's minimum net retention hereunder shall be $250,000 as respects any one risk.

As respects both Sections A and B, the Reassured shall be the sole judge of what constitutes one risk and the net retention appropriate thereto.

However the Reassured will not knowingly cede to this Contract more than

$5,000,000 where there is an identifiable accumulation of limits which are subject to one loss arising out of the same cause.

WARRANTIES 1) All cessions hereunder in respect of "System Business" not to exceed 50% of original reinsurance limit.

2) Reassured co-reinsure for 10% participation on all "System Business" ceded hereunder.

RATE Gross Original Rates Written Premiums Basis

COMMISSION *SECTION A*—PROPERTY

1) Thirty-one and one-half percent (31½%) on the net written premiums ceded hereunder as respects business assumed on a pro-rata basis. Twelve and one-half percent (12½%) on the net written premiums ceded hereunder as respects business assumed on an excess of loss basis.

2) In addition, at the close of each calendar year, Reinsurers shall make to the Reassured a further allowance equal to one percent (1%) of the annual premium earned hereunder.

*SECTION B*—CASUALTY

1) Twenty-eight and one-half percent (28½%) on the net written premiums ceded hereunder as respects business assumed on a pro-rata basis. Eleven and one-half percent (11½%) on the net written premiums ceded hereunder as respects business assumed on an excess of loss basis.

2) In addition, at the close of each calendar year, Reinsurers shall make to the Reassured a further allowance equal to four percent (4%) of the annual premium earned hereunder.

\* \* \* \* \* \* \* \*

GENERAL CONDITIONS As respects so-called "System Business" ceded to this Treaty, the net retention borne by a Company within the System, other than the Reassured, shall constitute compliance with the net retention requirement hereon. The reinsurance hereunder shall apply in respect of losses occurring as defined in the Reassured's certificates. LOC's as required by the Reassured for Unearned Premiums and Outstanding losses in respect of Non–Authorized Reinsurers only.

For purposes of the net retention requirement hereon as regards "System Business," quota share and excess of loss reinsurance maintained by a company within the System shall be disregarded.

For purposes of the net retention requirement hereon as regards "Non–System Business," only excess of loss reinsurances maintained by the Reassured shall be disregarded.

Errors and Omissions Clause

Insolvency Clause

G.L. Hodson & Son, Inc., Intermediary Clause (1978).

WORDING To be agreed Leading Underwriter only.

INTERNAL ARRANGEMENT Signing slips, special agreements and acceptances hereunder, provided Treaty Limits are not exceeded, to be agreed by Leading Underwriter only.

Renewals of risks previously specially agreed, to be accepted without further agreement.

PORTFOLIO TRANSFER OF UNEARNED PREMIUMS—Assumption and return where applicable.

Agree issue separate signing slips and Contract Wordings, if required. (Signing slips t.b.a L/U only).

It was the agreement of the parties under the terms of the Treaties that Graham Watson would produce and underwrite property and casualty facultative reinsurance, that is, reinsurance underwritten on an individual risk certificate basis.

NERCO made the following four material representations to the Plaintiff reinsurers to induce them to enter into a contractual relationship, and the Plaintiff reinsurers did rely on said representations in entering into the SANS Treaties:

1. That Graham Watson would produce and underwrite property and casualty *facultative* reinsurance. This representation means that Graham Watson would

underwrite reinsurance on an *individual*, risk-by-risk, certificate basis.

2. That Graham Watson would produce such reinsurance *directly* from system and non-system original insurers without the use of any intermediaries. This representation means that Graham Watson would be a direct writer of reinsurance from the original insurer, which reinsurance cessions would not be brokered.

3. That the Hartford Companies, along with First State, would be the "system business" original insurers. This representation means that the Hartford Insurance Group would be the source of "system business." The Hartford Insurance Group is made up of the so-called *Hartford Companies* and *First State*, an excess and surplus line carrier.

4. That Graham Watson would seek facultative reinsurance business from selected *primary* companies, rather than on a wholesale basis. This representation means that Graham Watson would assume reinsurance from selected insurance companies, not reinsurance companies or Managing General Agents, that is, from risk-bearing insurance entities.

In brief, NERCO represented that Graham Watson would underwrite *facultative* reinsurance, that is, underwritten on an individual risk certificate basis, produced from selected *primary* insurance companies, risk-bearing entities, including the *Hartford Insurance Group Companies, directly*, without the use of intermediaries. Phrased differently, NERCO represented that Graham Watson would establish a *direct* relationship with *primary* insurance companies to produce reinsurance business which Graham Watson would underwrite *facultatively*, that is, on an individual risk certificate basis.

The Plaintiff reinsurers were notified in late 1980 by means of Anniversary Placing Information, prepared in contemplation of the 1981 renewal of the SANS Treaties, that:

A. To date, the preponderance of the business has been assumed from First State Insurance Company and written on a pro rata basis; and

B. "Non-system business" represents a relatively small proportion of the total and what has been written is limited to Casualty business on an excess of loss basis emanating from Baccala and Shoop Insurance Services.

During the tenure of the SANS Treaties, NERCO assumed business not only from First State Insurance Company, but also from other Hartford Companies, including Hartford Specialty Company, Nutmeg Insurance Company, and Twin City Insurance Company. The Hartford Companies' business, excluding First State, was classified as "non-system business."

A fundamental issue in this case is whether Graham Watson did underwrite *facultative* reinsurance on the "system business" emanating from First State and on the "non-system business" emanating from the Managing General Agent, Baccala and Shoop, and from other sources, such as Crum and Forster Insurance Company, Harbor Insurance Company, Zurick Insurance Company, Allstate Insurance Company, Puritan Insurance Company, Allianz Underwriters, Inc., the intermediary G.L. Hodson, the Managing General Agent RFC Management Company, the Managing General Agent Guy Carpenter, American Reinsurance Company, Constitution State Insurance Company, Hartford Specialty Company and others. The majority of "non-system business" emanated from Baccala and Shoop, a Managing General Agent, through the intermediary G.L. Hodson.

The second fundamental issue is whether Graham Watson produced "non-system business" by establishing direct relationships with primary, risk-bearing, insurance companies.

Graham Watson underwrote reinsurance on business emanating from both "system" and "non-system" business by means of the "automatic" and/or "semi-automatic" method of underwriting.

"System business" emanating from First State was underwritten by means of an arrangement between First State and Graham Watson; "non-system business" was underwritten by means of formal contractual relationships called facilities between Graham Watson and its ceding sources.

In underwriting "non-system business," Graham Watson denominated the facilities under which its "automatic" and/or "semi-automatic" underwriting was done as "Master Facultative Certificates" ("MFCs").[3] "Non-system" sources ceded their reinsurance to Graham Watson by means of the "MFCs" facilities, all but a very few of which facilities had been brokered by various intermediaries, including G.L. Hodson.

The "automatic" and/or "semi-automatic" method of underwriting is done on the basis of bordereau risk submissions or by "layoff sheets," rather than on the basis of individual risk submissions, as is done in facultative risk-by-risk certificate underwriting. In this case, bordereau were used for "non-system" cessions and "layoff sheets" for "system" cessions.[4] A microfiche, a copy of First State's underwriting file on a particular risk, would be submitted to Graham Watson only when expressly requested by Graham Watson and only after the cession of the risk to the SANS Treaties had been consummated.

An individual risk submission is one made to a facultative reinsurance underwriter who would examine the individual risk offer, negotiate the terms of any acceptance, deliberate on his decision, and then would decide whether to accept the individual risk and either allocate it to a Treaty or to decline it. If he accepted the individual risk, he would then issue an individual facultative certificate to the ceding source.[5]

In contrast, the bordereau used here were multiple risk submissions from the ceding party which provided summary details on reinsurance policies. They were submitted periodically to the reinsurance underwriter at Graham Watson for post-attachment risk analysis after the risks had already been *automatically* allocated by the ceding source to the SANS Treaties. Graham Watson would conduct periodic "audits" of the records of the ceding entities many months after the risks had already attached to the SANS Treaties.

The distinction between the "automatic" and "semi-automatic" method of underwriting is that the "automatic" method permits the reinsurance underwriter to only cancel its contract with the original insurer, for it provides for no "right to reject" an individual risk; while the "semi-automatic" method authorizes the underwriter to reject the cession of an individual risk. However, the "right to cancel" and the "right to reject" are effective only *at the time* the right is exercised by the reinsurance underwriter and well *after* the reinsured risks had attached to the SANS Treaties. In brief, neither the "automatic" "right to cancel" nor the "semi-automatic" "right to reject" were effective *ab initio*, that is, from the date the risk had attached to the SANS Treaties.

All "system business" emanated from First State, an excess and surplus line carrier,

---

3. An MFC is *one* certificate covering the cession of *many* risks from the *same* source issued by the original reinsurer to the ceding company with a delegation of underwriting authority being granted to the ceding company; in contrast, an individual facultative certificate is issued by the original reinsurer to the ceding company, after the individual risk has been facultatively underwritten by the underwriter of the original reinsurer.

4. A risk bordereau is a multiple risk submission with a brief one-line summary which includes the name of the insured and policy number, the name of the risk, the period of the risk, the amount being reinsured, policy limits, retention, and net premium ceded. A "layoff sheet" is not technically a bordereau, but is an accounting document. In property business, however, it performs the function of a bordereau.

5. Dr. Klaus Gerathewohl et al in the authoritative work *Reinsurance Principles and Practice*, Volume II, Chapter 14, Particular Aspects of Facultative Reinsurance, 1. The nature of facul-

tative reinsurance, defined facultative reinsurance as follows:

> Facultative reinsurance always covers a single risk. The direct (primary) insurer, after deducting his retention and the cession to his obligatory reinsurance treaties, is then at liberty to decide whether—and if so, to what extent—he required reinsurance of his remaining liability. He is also free to select a suitable reinsurer of his choice for each individual risk. The reinsurer, in turn, can also decide at his own free will whether, to what extent, and at what reinsurance terms and premiums he would like to assume a share in a risk offered to him by way of facultative reinsurance. In each case, therefore, an individual reinsurance agreement is entered into for each individual risk, the parties thereto having the power to decide at their own free will whether they are desirous of seeking or accepting such reinsurance (thus the term "facultative" reinsurance).

during the tenure of the SANS Treaties. No "system business" emanated from the other Hartford Companies. The First State insurance underwriter accepted risks and, by means of a "layoff sheet," *automatically* allocated a portion of the risks to the SANS Treaties.

Most "non-system business" emanated from Managing General Agents, which are not risk-bearing insurance entities, or from reinsurance intermediaries, and was not directly placed by primary insurance companies with Graham Watson. Graham Watson, under Master Facultative Certificate facilities, delegated its underwriting authority to the ceding sources or to the intermediaries, who *automatically* allocated the risks to the SANS Treaties.

There is no evidence that Graham Watson did adequate individual risk underwriting even *after* the risks had attached to the SANS Treaties. Neither risk bordereau nor "layoff sheets" provided Graham Watson with the quantity or quality of information it needed to facultatively underwrite the risks ceded to the SANS Treaties. Most notably lacking from both bordereau and "layoff sheets" was any reference to the loss experience as regards the risk to be ceded. Such loss experience information, which assists an underwriter in predicting future losses, is essential to the facultative underwriting process. Also lacking was a detailed description of the risk that was ceded to the SANS Treaties. "Layoff sheets" set forth only the name of the original insured and a minimalist description of their operations, referring, for example, to the insured's operations as "Restaurants et al." Similarly, bordereau provided Graham Watson with little information concerning the nature of the risk to be reinsured. In one representative instance, bordereau described an insured's operations as "Door and Hatchway MFG." Such descriptions do not adequately present the risks inherent in or associated with the operation of the insured.

Significantly, First State files reflect that Graham Watson never rejected any risk ceded by First State during the entire course of the SANS Treaties; and, as of February 23, 1983, Baccala and Shoop reported that Graham Watson had never rejected any risk which Baccala and Shoop had ceded to the SANS Treaties. Such circumstances belie Defendant NERCO's defense that Graham Watson did facultatively underwrite the risks ceded under the SANS Treaties.

From the very inception of the negotiations leading to entering into the SANS Treaties with the Plaintiff reinsurers, Defendant NERCO planned to employ the "automatic" and/or "semi-automatic" method of underwriting both "system" and "non-system" business, even though its sub-agents, unaware of NERCO's secret intention, were negotiating a treaty in which the underwriting would be done on an individual risk certificate basis.

■ Upon a review of the evidence, the Court finds that Graham Watson did not facultatively underwrite, that is, underwrite on an individual risk certificate basis as represented, any of the "system business" nor virtually any of the "non-system business"; Graham Watson underwrote all "system business" and virtually all "non-system business" by the "automatic" and/or "semi-automatic" method of underwriting.

The Court also finds, on the basis of the evidence, that most of the "non-system business" emanated from MGAs through the use of intermediaries and from intermediaries themselves, and was not produced from primary risk-bearing insurance entities directly. Although the Plaintiff reinsurers were aware that Baccala and Shoop, an MGA, had ceded to the SANS Treaties approximately five percent of the total business during the first year, 1980, they were never apprised that, during the ensuing three years, Baccala and Shoop would cede the majority of "non-system business" and that other MGAs and intermediaries would cede, in conjunction with Baccala & Shoop, most of the "non-system business" to the SANS Treaties. "Non-system business" constituted, over the course of the SANS Treaties, approximately one-half of the total business ceded to the Treaties.

Plaintiffs have stated a claim against the Defendants for common law fraud. In order to prevail on that claim, they must prove by

clear and convincing evidence that Defendants made a false representation of material fact with knowledge of its falsity for the purpose of inducing Plaintiffs to act thereon, and that Plaintiffs relied upon that representation as true and acted upon it to their detriment. *Logan Equipment Corp. v. Simon Aerials, Inc.*, 736 F.Supp. 1188, 1199 (D.Mass.1990); *Danca v. Taunton Savings Bank*, 385 Mass. 1, 429 N.E.2d 1129, 1133 (1982); *Slaney v. Westwood Auto Inc.*, 366 Mass. 688, 322 N.E.2d 768, 779 (1975); *Powell v. Rasmussen*, 355 Mass. 117, 243 N.E.2d 167, 168–9 (1969); *Zimmerman v. Kent*, 31 Mass.App.Ct. 72, 575 N.E.2d 70, 74 (1991).

Courts considering reinsurance disputes have refined and elaborated on the common law as it relates to misrepresentation. In the reinsurance context, they have focused their attention specifically on the obligations of the reinsured and the reinsurer to exercise good faith and to disclose all material facts. 13 A.J. Appleman and J. Appleman, *Insurance Law and Practice* § 7693, at 505 (1976). Adopting language common in the reinsurance industry, the Supreme Court described such obligation as being one *uberrimae fidei,* or "of utmost good faith." *Sun Mutual Insurance Co. v. Ocean Insurance Co.*, 107 U.S. 485, 510, 1 S.Ct. 582, 599, 27 L.Ed. 337 (1882). The Court explained that "the duty of communication, indeed, is independent of the intention, and is violated by the fact of concealment even where there is no design to deceive." *Id.* More recently, Judge Coffin, writing for the First Circuit, acknowledged the special relationship that exists between reinsured and reinsurer. In *A/S Ivarans Rederei v. Puerto Rico Ports Authority,* he noted,

> As between the reinsured and the reinsurer, there is no principle of imputed knowledge of facts material to the risk that the reinsurer is asked to assume; to the contrary, there is a duty on the reinsured to disclose such facts. Indeed, were this not so, the business of reinsurance would rest on blind faith in the reinsured.

617 F.2d 903, 905 (1st Cir.1980).

■ Plaintiffs have also stated a claim for breach of contract against Defendant NERCO. They allege that NERCO breached the terms of the SANS Treaties. A "breach of contract" is a failure to perform for which a legal excuse is lacking. *Realty Developing Co. v. Wakefield Ready–Mixed Concrete Co.*, 327 Mass. 535, 100 N.E.2d 28, 30 (1951); 11 Williston, Contract § 1290 (3d ed. 1968). To succeed as to this claim, Plaintiffs must prove by a preponderance of the evidence that a contract existed between themselves and the Defendants, and that Defendants breached the terms of that contract. The essentials of a contract action are the parties' agreement supported by valid consideration, plaintiff's readiness, willingness and ability to perform, defendant's breach preventing performance and damage to the plaintiff. *Singarella v. City of Boston,* 342 Mass. 385, 173 N.E.2d 290, 291 (1961).

■ Plaintiffs have alleged, in addition, that Defendants violated § 1962(a)–(c) of the Racketeer Influenced and Corrupt Organizations Act, (RICO), 18 U.S.C. § 1961 *et seq.* (1991) by engaging in a "pattern of racketeering" with respect to Graham Watson, which they allege is a RICO "enterprise." They allege that the Defendants' racketeering activity involved the "predicate acts" of mail and wire fraud in violation of 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud), and that such frauds injured the Plaintiffs.

Section 1962(a) of RICO provides in pertinent part that

> It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of any unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to invest, directly or indirectly, any part of such income, or the proceeds of such income, in the acquisition of any enterprise which is engaged in, or the establishment or operation of, any enterprise which is engaged in, or the activities which affect, interstate or foreign commerce.

Section 1962(b) provides that

> It shall be unlawful for any person through a pattern of racketeering activity or through collection of any unlawful debt to

acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

Section 1962(c) provides that

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

■ Accordingly, if they are to prevail on their civil RICO count, Plaintiffs must prove, by a preponderance of the evidence, *Liquid Air Corp. v. Rogers,* 834 F.2d 1297, 1303 (7th Cir.1987), both the existence of an "enterprise" and a connected "pattern of racketeering activity." *United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246 (1981). To prove that an "enterprise" existed, they must present evidence of an ongoing organization, formal or informal, and evidence that various associates functioned as a continuing unit. *Id.* To prove a "pattern of racketeering activity," Plaintiffs must establish the occurrence of at least two "predicate acts," show that the predicates were related, and that they pose a threat of continued criminal activity. *McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc.,* 904 F.2d 786, 788 (1st Cir.1990) (citing *H.J. Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 250, 109 S.Ct. 2893, 2906, 106 L.Ed.2d 195 (1989)). Section 1961(1) defines "racketeering activity" as constituting certain state and federal crimes. These crimes are the "predicate acts" which Plaintiffs must establish.

The "predicate acts" which the Plaintiffs allege were part of a pattern of racketeering activity are mail and wire fraud. Therefore, to show a pattern of racketeering activity, Plaintiffs must prove either mail or wire fraud. To prevail on their RICO claim with respect to mail fraud, Plaintiffs must prove that Defendants intentionally participated in a scheme to defraud the Plaintiffs, and used the mails in order to execute that scheme. *Pereira v. United States,* 347 U.S. 1, 8, 74

S.Ct. 358, 362, 98 L.Ed. 435 (1954). To prevail on their RICO claim with respect to wire fraud, Plaintiffs must prove that Defendants participated in a fraudulent scheme which was furthered by the use of interstate transmission facilities. *United States v. Corey,* 566 F.2d 429, 430, n. 2 (2d Cir.1977).

■ Finally, Plaintiffs have alleged that Defendants violated Mass.Gen.L. ch. 93A, § 2 (1990). That Section provides in pertinent part that

Unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce are hereby declared unlawful.

Section 11 grants a right of action under Chapter 93A to businesses engaged in disputes with other businesses. Mass.Gen.L. ch. 93A, § 11.

■ In order to establish a violation of Chapter 93A, the Plaintiffs must show that the action of the Defendants fell "within at least the penumbra of some common-law, statutory, or other established concept of unfairness, or were immoral, unethical, oppressive or unscrupulous and resulted in substantial injury to ... other businessmen." *Quaker State Oil Refining Corporation v. Garrity Oil Company,* 884 F.2d 1510, 1513 (1st Cir.1989) (citing *PMP Associates, Inc. v. Globe Newspaper Company,* 366 Mass. 593, 321 N.E.2d 915, 917 (1975); *accord Pepsi–Cola Metro Bottling Co. v. Checkers, Inc.,* 754 F.2d 10, 17–18 (1st Cir.1985)). In the context of business-to-business disputes under Section 11, the courts have additionally employed the so-called "rascality standard" which states that "the objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble world of commerce." *Id.* (citing *Levings v. Forbes & Wallace, Inc.,* 8 Mass.App. 498, 396 N.E.2d 149, 153 (1979)); *see also, Anthony's Pier Four, Inc. v. HBC Associates,* 411 Mass. 451, 583 N.E.2d 806, 822 (1992) (recognizing that in cases between sophisticated business people, a claimant needs to show a greater level of "rascality" on the part of the defendant than would a less sophisticated party).

■ Chapter 93A cases have proven to be extremely fact-specific. Thus the specific circumstances surrounding an allegation under 93A "must be sized up one by one." *Doliner v. Brown,* 21 Mass.App.Ct. 692, 489 N.E.2d 1036, 1039 (1986).

■ The fundamental material term in the SANS Treaties is the term "facultative" underwriting. The parties to the contract understood the meaning of that term in its standard and traditional sense, namely, underwriting on a risk-by-risk certificate basis, the classic meaning of the term. NERCO contracted under the SANS Treaties that Graham Watson would examine each individual risk submission by the ceding company on a risk-by-risk basis and, if the risk be accepted, Graham Watson would then issue an individual certificate to the ceding company. In fact, NERCO assumed its SANS Treaties' business by the "automatic" and/or "semi-automatic" method of underwriting, whereby Graham Watson delegated its reinsurance underwriting authority to the source company to automatically cede risks to the SANS Treaties. This constituted a material breach of the terms of the contract. The breach of this most material element of the contract by NERCO was intentional, deliberate and planned.[6]

In addition, the Plaintiff reinsurers were induced to enter into the SANS Treaties with NERCO on the representation that Graham Watson would produce and underwrite facultative reinsurance and cede such risks, underwritten on an individual certificate basis, to the SANS Treaties. The Plaintiff reinsurers entered into this contractual relationship in reliance on said representation. However, from the beginning of the negotiations, it was NERCO's plan, not to underwrite risks on an individual risk certificate basis, but rather to underwrite reinsurance by the "automatic" and/or "semi-automatic" method of underwriting.

NERCO knew that the Plaintiff reinsurers understood the meaning of the material term "facultative" in its standard and traditional sense of risk-by-risk certificate underwriting and was well aware that it, itself, was secretly using the term in a special sense without ever disclosing such special meaning to the Plaintiff reinsurers. Even the Defendant NERCO's sub-brokers understood and used the term as meaning individual risk-by-risk certificate underwriting when they placed the SANS Treaties with the Plaintiff reinsurers. NERCO's intention to use the "automatic" and/or "semi-automatic" method of underwriting was not even disclosed to their own sub-brokers.

Thus, the representation that reinsurance underwriting would be individual risk certificate underwriting was knowingly false when made, for it was always NERCO's plan to underwrite risks by the "automatic" and/or "semi-automatic" method of underwriting and NERCO was well aware that the Plaintiff reinsurers understood the term "facultative" in its traditional and standard meaning of risk-by-risk certificate underwriting.

That the misrepresentation was knowingly made is further shown by the use of the term "facultative," as set forth in the Placing Information, where it is clearly used in its standard sense. This is established by the use of the term "facultative" in reference to the NERFAC facility, an individual risk certificate underwriting facility of NERCO.[7]

6. NERCO also breached its contractual obligation to produce property and casualty facultative assumed business, for under the "automatic" and/or "semi-automatic" method of underwriting the reinsurance business is actually produced by the ceding source companies and not by the original reinsurer.

NERCO also violated its contractual obligation to "co-reinsure for 10 percent participation on all 'System Business' ceded hereunder," as required by Warranty No. 2 in the Slip. Furthermore, although NERCO did not violate its contractual obligation under Warranty No. 1 in the Slip, it is to be noted that neither did it comply with its "understanding" with the lead Plaintiff Reinsurer underwriter that the other 50 percent of the business not ceded to the SANS treaties would be underwritten by facultative reinsurance underwriters.

7. The term "facultative" in the Slip, which is related to and provided with the Placing Information, is used with the same meaning as in the Placing Information. The language of the Slip, "Business classified by the Reassured as Property and Casualty Facultative Assumed business produced and underwritten by the Graham Watson division of Cameron & Colby Co., Inc." was understood by the parties to the contract as providing NERCO with a limited discretion in classi-

NERCO also represented that it would produce "non-system business" from primary, risk-bearing, insurance companies directly; in fact, it produced most of such business from MGAs through intermediaries and from intermediaries themselves, and yet never disclosed these material matters to the Plaintiff reinsurers, as it was required to do.

The Plaintiff reinsurers, the retrocessionaires under the SANS Treaties, placed their trust and confidence in the representations of NERCO that Graham Watson would underwrite both "system" and "non-system" reinsurance business on an individual, risk-by-risk, certificate basis and that Graham Watson would produce "non-system" reinsurance business directly from primary insurance companies without the use of intermediaries. These three representations were made by NERCO with the intention of inducing the Plaintiff reinsurers to enter into the SANS Treaties, and, in reliance on said three representations, the Plaintiff reinsurers did enter into the SANS Treaties to their detriment. These three representations of NERCO were knowingly false.

In conclusion, NERCO promised the Plaintiff reinsurers that Graham Watson would produce and underwrite reinsurance business in the same manner as did the direct professional reinsurance writers, such as General Reinsurance Corporation, that is, from similar selected *primary* insurance sources, by the same *direct* approach, and by the same *individual risk certificate method.* By such means the direct professional reinsurance writers were known to produce the highest quality reinsurance business. The contractual promise and the three inducing representations were not kept by NERCO, nor did NERCO intend to keep such promises.

Participation in the SANS Treaties resulted in extensive financial losses being suffered by the Plaintiff reinsurers, as well as by the Defendants. In the circumstances of this case, it is not feasible to reasonably calculate damages on the basis of the "benefit of the bargain" method of damages,[8] and thus the only appropriate remedy is to rescind the SANS Treaties as a matter of equity and to award to the Plaintiff reinsurers the amount of $23,281,936.06, plus simple interest at 12 percent on all balances, for a total amount of $37,501,701.12, which amount of money constitutes the difference between claims paid by the Plaintiff reinsurers less premiums paid to the Plaintiff reinsurers during the tenure of the SANS Treaties.[9] *General Electric Company v. Callahan,* 294 F.2d 60, 64 (1st Cir.1961) (availability of remedy at law must be "clear"), *cert. dismissed,* 369 U.S. 832, 82 S.Ct. 851, 7 L.Ed.2d 840 (1962). *Cf. Calvert Fire Ins. Co. v. Unigard Mut. Ins. Co.,* 526 F.Supp. 623 (D.Neb.1980) (granting avoidance of a reinsurance treaty for breach of contract and misrepresentations in connection with the placement of the reinsurance), *aff'd,* 676 F.2d 707 (8th Cir.1982).

Parties to a reinsurance contract, such as the SANS Treaties, have been described as partners in a marriage or in a business relationship, owing to each other the highest degree of fidelity. The relationship is founded on the confidence one party places in the integrity of the other. This is especially so when the reinsurers "pass their pen" to the reinsured and fully authorize it to produce and underwrite reinsurance on their behalf. When the reinsured delegates this special trust to third parties, contrary to its contractual obligation and to its pre-contrac-

---

fying the types of reinsurance and that is this Court's interpretation on the basis of the evidence.

8. In order for the Plaintiffs to establish contract damages it would have been necessary to obtain the financial records of the major direct professional reinsurance companies, such as General Reinsurance Corporation, which financial records are confidential and not accessible to third parties.

9. The Court finds that the conduct of NERCO constitutes a violation of Chapter 93A, Section 2

of the General Laws of the Commonwealth of Massachusetts; the Court rules, as a matter of law, that Title 18, United States Code, Sections 1961–1968 do not apply to the facts of this case on the ground that the Plaintiffs have failed to establish that they suffered an "investment" injury under Section 1962(a) or an "acquisition" injury under Section 1962(b) or that the three Defendants were separate persons as required under Section 1962(c). However, the Court assumes pendant jurisdiction of the case.

384

tual promises and without disclosing such delegation to its partners, the reinsured is unfaithful to the union and debases the sanctity of the relationship. In such a situation, the relationship must be annulled.

The Court finds for the Plaintiffs in the amount of $37,501,701.12, plus interest and costs.

SO ORDERED.