STEPHEN GLICKMAN & others, trustees,[1] vs. HAROLD BROWN & another.[2]

Norfolk.   October 10, 1985. — December 16, 1985.

Present: GRANT, ARMSTRONG, & SMITH, JJ.

*Consumer Protection Act,* Unfair act or practice, Multiple damages, Sale of condominium unit, Attorney's fees. *Practice, Civil,* Trustees of condominium management trust. *Condominiums,* Management.

A real estate developer who had converted an apartment building into condominium units and his marketing agent violated G. L. c. 93A, § 2 (*a*), by representing to prospective purchasers of condominium units that the common heating system was in good repair, even if they had no actual knowledge of the defects in the system, where the developer and the agent could have readily discovered the defects in the system had they made an effort to do so. [234-235]

In an action under G. L. c. 93A by the trustees of a condominium trust against a real estate developer and his agent to recover the cost of repairing a common heating system which the defendants had represented to prospective purchasers as being in good repair, the plaintiffs were not required to establish that the unit owners had relied on the statements about the heating system in deciding to buy, but were entitled to recover on a showing that there was a causal relationship between the defendants' misrepresentations and the loss, i.e., the cost of repairing the heating system. [236]

In an action under G. L. c. 93A by the trustees of a condominium trust against a real estate developer and his agent to recover the cost of repairing a common heating system which the defendants had represented to prospective purchasers as being in good repair, the trustees were entitled to recover the entire cost of repairing the heating system and were not limited to recovering the aggregate of the amounts assessed to those condominium owners who testified in the case, in person or by deposition. [236-238]

In an action under G. L. c. 93A by the trustees of a condominium trust against a real estate developer and his agent in which the plaintiffs were

---

[1] Carol E. Murphy, Ruth Ottinger, Michael Zack, Jacqueline Brown, John Beaton and David Allen.

[2] Robert Keezer.

awarded actual damages of $247,386 as the cost of repairing a defective heating system which the defendants had represented to be fully functional, there was no merit to the defendants' claim that an award of $35,000 in attorney's fees was excessive. [238]

This court declined to consider an appeal by the plaintiffs in a consumer protection case from the judge's refusal to award multiple damages, where the plaintiffs' claim to such damages was based on an alleged bad faith response to their demand letter, and where the sufficiency of any response by the defendants to the demand letter had not been considered at trial. [238-239]

CIVIL ACTION commenced in the Superior Court Department on February 17, 1982.

The case was heard by *Paul K. Connolly,* J.

*Steven M. Brody (Richard A. Freedman* with him) for the defendants.

*Gerald H. Abrams* for the plaintiffs.

GRANT, J. This case is concerned with the conversion of the apartment building at 19 Winchester Street, Brookline, into condominium units. The event which chilled the relationship between the unit owners on the one hand and the developer (Brown) and his marketing agent (Keezer) on the other was the failure of the building's common heating system shortly after Brown and Keezer lost control of the management of the condominium. The plaintiffs, who are the trustees of the condominium management trust (G. L. c. 183A, § 8 [*i*]), brought this action against Brown and Keezer (G. L. c. 183A, § 10 [*b*] [4]) in six counts, only four of which are still viable. The plaintiffs sought to recover the total cost of repairing the common heating facilities. Count one, brought under G. L. c. 93A, §§ 9 and 11, as amended through St. 1979, c. 72, §§ 1 and 2, respectively, alleged that the defendants had engaged unfair and deceptive marketing practices by misrepresenting the condition of the heating system to prospective purchasers of condominium units. Counts two, three and four alleged fraud and deceit, reckless and negligent misrepresentations under the common law, and breaches of contract and warranties, respectively. After a bench trial, the judge found for the plaintiffs on counts one through four and a single judgment was entered

for actual damages in the amount of $247,386, plus interest, costs and $35,000 in attorney's fees (under count one).[3]

The defendants have appealed. The plaintiffs have cross appealed from the denial of multiple damages on their c. 93A claim.

1. *The Factual Background and the Findings and Rulings of the Trial Judge.*

(a) *The Evidence.*

The judge could have found the following facts. Brown purchased the building in February of 1979 for the purpose of reselling the existing apartments as condominium units. In April of 1979 he recorded a master deed and a declaration of trust (including a set of by-laws) in accordance with the provisions of G. L. c. 183A, §§ 8 and 10 through 12. He appointed trustees who, in turn, hired him to manage the common areas and facilities until such time as substantially all the units should be sold. Most of the units (c. 183A, § 1) were sold by August of 1979. The successor trustees, elected by the unit owners (c. 183A, § 1), continued to contract with Brown for his management services until early in 1981, shortly after the full extent of the defects in the common heating system was revealed to the unit owners.

That system, which is part of the common facilities of the condominium (c. 183A, §§ 1, 8[e]), provides forced hot water to each of the building's nine floors by way of centrally located iron pipes called risers. The hot water is then distributed to each unit via smaller pipes located inside the walls. There are two supply risers and approximately eighteen return risers. The supply risers can be visually inspected through access doors, one of which is located on each floor. The building once had a central air conditioning system which was designed to use the same risers as the heating system. The air conditioning was disconnected well prior to Brown's ownership in an attempt to stop widespread leaks. Based on the observed condition of

---

[3] The uncontroverted evidence was that the contract price to repair the heating system was $247,086. Neither party has brought the $300 discrepancy to the attention of either court.

the risers when they were replaced in 1981, severe corrosion and deterioration had been present for at least ten years. The corrosion could have been seen visually, and an inspection would have indicated the possibility of leaks. The risers may have been inadequate for their intended purpose for as long as ten years prior to their replacement in 1981. Brown's own heating repairmen concluded that the corrosion had started well prior to 1980 because of the original design, which combined the air conditioning and heating systems.

Brown made a personal inspection before purchasing the building but did not view any of the risers. Two of Brown's employees also inspected the building but did not view the risers. One of Brown's employees received an engineering report shortly after Brown purchased the building which stated that the heating system had not been well maintained. Brown, through various heating repairmen, attempted to keep the system functioning but made no effort to repair the risers, claiming that no repairs were necessary.

There was testimony (either live or by deposition) from twelve unit owners, some of whom had been tenants in the building prior to its conversion to condominiums. The former tenants reported periodic failures of the heating system, accompanied by water leaking through the walls, prior to Brown's ownership. Those same problems continued after Brown purchased the building. In the summer of 1979, as the condominium units were being marketed, Brown's representatives continually assured tenants in the building who were reluctant to buy because of unreliable heat that it would be fixed. Similar representations were made to prospective purchasers of units who had not been tenants. In addition, Brown's people refused to include anything about the heating system in individual purchase and sale agreements. One buyer asked for a copy of the engineering report Brown had received but was refused. Another buyer, when she noted the absence of any reference to the heating system in a list of proposed capital improvements in the building, was told that the heating system was fine.

The problems with the heating system continued during the first heating season (1979-1980) after the marketing period.

There were leaks from walls, ceilings and floors. One of Brown's employees learned in February or March of 1980 that there were leaks in the walls. Brown's servicemen acknowledged that it was good practice to check the risers any time a leak was discovered. Brown did some repair work on parts of the heating system in the summer of 1980 but did not check the risers and never had any repair work performed on them. During the next heating season (1980-1981) the situation worsened, despite repeated service calls by Brown's repairmen. When the riser corrosion was finally revealed to the unit owners, in October of 1980, they elected to delay major repair work until the following spring. In May of 1981 the full extent of the damage to the risers was known for the first time. After the risers were replaced in 1981, there were no further problems with the heat or with leaks in the building.

(b) *The Judge's Findings and Rulings.*

The judge found that Brown, through his employees and agents "either represented to potential buyers that the heating system . . . was in good repair, or that problems in the heating system would be resolved . . . [but] that these representations were contrary to the true state of affairs." The judge also stated that Brown "had to be aware of the problems in the [heating] system," apparently referring to the corroded risers which, when replaced, ultimately proved to be the major cause of the lack of heat and the leaks. Thus, the decision initially appears to be based on fraud. However, the judge stated that the misrepresentations made by Brown had not been "willful" as that word is used in c. 93A, but had been made negligently. The judge also found that "the defendants in some instances negligently represented that the heating system was in good repair; in other instances they negligently represented that steps would be taken to place the system in good repair. It was clearly foreseeable that such negligence would result in the injury sustained by plaintiffs here, i.e., the necessity of assuming the financial burden of total replacement of the risers in the heating system." We think it apparent from the evidence already summarized, from the findings just quoted, and from the finding against the plaintiffs on the question of multiple damages that

the judge's determination of damages is based on negligence rather than fraud.

(c) *Liability Under G. L. c. 93A on a Negligence Theory.*

In considering the defendants' appeal, the first question to be answered is whether, under c. 93A, liability can rightfully be imposed for negligent misrepresentations. The plaintiffs' claim is governed by the versions of c. 93A, §§ 9 and 11, which were in effect at the time Brown made the misrepresentations. See *Murphy* v. *Charlestown Sav. Bank,* 380 Mass. 738, 743 (1980); *Swanson* v. *Bankers Life Co.,* 389 Mass. 345, 346 n.3 (1983). As the relevant language of c. 93A, § 9, as in effect prior to St. 1979, c. 406, § 1, was substantially the same as that still appearing in c. 93A, § 11, the claims under each section need not be treated separately.[4] The sine qua non, of course is a violation of c. 93A, § 2.

Liability under § 2 is determined by analysis of the circumstances and facts of each case to determine whether the practice in question is "within any recognized conception of unfairness" or is "immoral, unethical, oppressive or unscrupulous" or "causes substantial injury to consumers (or competitors or other businessmen)." *PMP Associates, Inc.* v. *Globe Newspaper Co.,* 366 Mass. 593, 596 (1975). Although a negligent act, standing by itself, does not amount to a violation of § 2,

---

[4] Both sections required the plaintiff to prove a "loss of money or property, real or personal, as a result of the use or employment . . . of an unfair or deceptive act or practice declared unlawful by section two," as opposed to the present § 9, which requires only that a plaintiff be "injured by another person's use or employment of any method, act or practice declared to be unlawful by section two." Compare §§ 9(1) and 11, as in effect prior to St. 1979, c. 406, § 1, with § 9(1), as amended through St. 1979, c. 406, §§ 1 and 2. (The relevance of § 11 is that blocks of units were purchased by investors for resale rather than for personal use.) The defendants argue that because a narrower standard should be applied when judging acts or practices directed toward businessmen under § 11, as opposed to consumers under § 9, the claims under each section should be viewed separately. Even if such a distinction exists (compare *Levings* v. *Forbes & Wallace, Inc.,* 8 Mass. App. Ct. 498, 503-504 [1979], with *Hannon* v. *Original Gunite Aquatech Pools, Inc.,* 385 Mass. 813, 824-825 [1982]), the argument ignores the possibility that the defendants could be liable for the entire cost of replacement under either section.

a deceptive act which is the result of a defendant's negligence is actionable without more. *Linthicum* v. *Archambault,* 379 Mass. 381, 388 (1979). *Swanson* v. *Bankers Life Co.,* 389 Mass. at 349. *MacGillivary* v. *W. Dana Bartlett Ins. Agency of Lexington, Inc.,* 14 Mass. App. Ct. 52, 58-61 (1982). The circumstances of this case fall within the ambit of the question left open in *Nei* v. *Burley,* 388 Mass. 307, 315-316 (1983), namely whether a person in a trade or business violates c. 93A, § 2(*a*), by misrepresenting a material fact when he has made no effort to determine the truth.

One purpose of c. 93A is to provide "a more equitable balance in the relationship of consumers to persons conducting business activities." *Commonwealth* v. *DeCotis,* 366 Mass. 234, 238 (1974). Sellers are obviously in a better position to evaluate the truth of their advertising than are consumers or other purchasers. While sellers may expound upon the virtues of their products, hoping to deemphasize their disadvantages, they may not affirmatively misrepresent the truth if they know it. See *Nei* v. *Burley* 388 Mass. at 317. We think it follows that sellers should not be allowed to misrepresent the truth simply because they have not made reasonable efforts to ascertain it. We hold (if there were any doubt about it) that a negligent misrepresentation of fact the truth of which is reasonably capable of ascertainment is an unfair and deceptive act or practice within the meaning of c. 93A, § 2(*a*).

There is no error, then, in the judge's conclusion that the defendants are liable under c. 93A. Brown, through his employees and agents (who included Keezer), represented to prospective purchasers of condominium units that the common heating system was fully functional. There was sufficient evidence for the judge to find that the heating system was defective in 1979 because the risers were by then severely corroded. Neither Brown nor any of his representatives visually checked the risers. Had they done so, they would have discovered the defects in the system. It follows that both defendants violated c. 93A, § 2(*a*), by making representations which negligently disregarded the easily ascertainable truth.

The defendants argue that the plaintiffs' claim must fail because no unit owner actually relied on the statements about the heating system when making the decision to buy. To succeed on a claim under either § 9 or §11 the plaintiffs need not offer evidence of reliance. *International Fid. Ins. Co.* v. *Wilson,* 387 Mass. 841, 850 (1983). All that is required in a case such as the present is proof of a causal relationship between the misrepresentations and the cost of replacing the risers. *Ibid.* The judge warrantably found that there was such a relationship. That finding cannot be pronounced "clearly erroneous" within the meaning of Mass. R. Civ. P. 52(a), 365 Mass. 816 (1974). *Building Inspector of Lancaster* v. *Sanderson,* 372 Mass. 157, 160-161 (1977).[5]

2. *Award of Entire Amount of Damages to the Trustees.*

The defendants challenge the award to the plaintiff trustees of the entire cost of replacing the risers. No claim is made that the trustees do not have standing to bring the action, nor is there any contention that the trustees cannot bring suit in a representative capacity. The crux of the appeal as to this aspect of the case is that the trustees represent only a few of the unit owners rather than the entire ownership of the building. According to the defendants, recovery should be limited to the aggregate of the amounts assessed to those owners who testified in person or by deposition.[6] This argument fails for at least two reasons. First, under the provisions of G. L. c. 183A, which provides a comprehensive scheme for condominium development and ownership, the trustees act only for the benefit of all the unit owners, and, second, there is no sound reason why the defendants should be allowed to escape liability for the total cost of the repairs by using the statute as a device to divide up the ownership of the building.

---

[5] As there was no error in entering judgment for the plaintiffs on count one of the complaint, we need not give separate consideration to any of counts two through four.

[6] In July of 1981 the trustees made a special assessment on the unit owners in accordance with § 5.4.2 of the by-laws to pay for the riser replacements. The amounts assessed corresponded to each unit owners percentage of ownership in the common areas and facilities and were approximately $2,500 per unit. Those assessments have been paid.

General Laws c. 183A, § 5(*a*), provides that each unit owner has title to an undivided interest in the common areas and facilities of the condominium. Although the unit owners collectively hold title to the heating system, a separate entity is responsible for its management, maintenance, repair and replacement. C. 183A, §§ 1, 5(*e*), and 11 (*a*). Master Deed ¶¶ 5(b) (3)-(4). In this case a trust serves those purposes. Master Deed ¶ 10. The beneficiaries of the trust are the unit owners, each having an undivided interest in all the common facilities. C. 183A, § 10(*a*). Declaration of Trust § 4.1. See *Barclay* v. *DeVeau,* 11 Mass. App. Ct. 236, 240, *S.C.,* 384 Mass. 676, 681 (1981). The trustees, acting in behalf of "the owners of record from time to time of the Units of the Condominium" (Declaration of Trust § 2.1) are obligated to maintain the heating system and assess the cost thereof to the owners. C. 183A, § 11(*a*). By-laws § 5.3.1. See also c. 183A, §§ 1, 6(*a*) and 7. Except in emergencies, the trustees have exclusive control over the common facilities and are the sole point of contact between the unit owners and third parties as to matters involving the heating system. C. 183A, §§ 5(*e*), (*f*) and (*g*), 10(*b*) (4) and 13. By-laws § 5.1(xi). Of particular relevance are the statutory provisions that the expenses and any profits of litigation involving the common areas and facilities are to be shared by all the unit owners. C. 183A, §§ 6(*a*) and 10(*b*) (4). It follows both that the trustees can bring suit against the defendants for defects in the common facilities and that the trustees cannot represent less than all the unit owners.

The net effect of establishing a c. 183A condominium is that misrepresentations made by the developer to the purchasers of individual units concerning the adequacy of common facilities are to be taken as having been made to the trustees of the trust or other "organization of unit owners" (c. 183A, § 1) who or which assume(s) the management of the condominium after the developer loses control. If the recovery in a case such as the present were to be limited to the assessments made on individual owners who testify, the trustees would recover only a fraction of the total damages and the developer would receive an undeserved windfall. Here, the defendants

cannot dispute that if they had sold the building to a single owner, they would be liable for the entire amount of damages. As we have said, no sound reason exists why the defendants should be allowed to escape the major portion of their liability by dividing the ownership under c. 183A. The statute contemplates just the opposite.

We hold that the entire amount of damages is recoverable by the trustees. We note that other courts have reached a like result under not dissimilar statutory provisions. See *Wittington Condominium Apts., Inc.* v. *Braemar Corp.,* 313 So. 2d 463, 464, 467-468 (Fla. Dist. Ct. App. 1975); *Drexel Properties, Inc.* v. *Bay Colony Club Condominium, Inc.,* 406 So. 2d 515, 516, 519-520 (Fla. Dist. Ct. App. 1981); *Starfish Condominium Assn.* v. *Yorkridge Serv. Corp.,* 295 Md. 693, 698, 703-705, 706-708 (1983); *Siller* v. *Hartz Mountain Associates,* 93 N.J. 370, 376-378, 379-381 (1983); *Stony Ridge Hill Condominium Owners Assn.* v. *Auerbach,* 64 Ohio App. 2d 40, 43-44 (1979); *1000 Grandview Assn.* v. *Mt. Washington Associates,* 290 Pa. Super. 365, 368-370 (1981).

3. *Amount of Attorney's Fees.*

The argument that the award of $35,000 in attorney's fees is excessive is based solely on the premise that the maximum possible damage award is the amount assessed to the unit owners who testified. There is no contention that $35,000 is unreasonable if (as we have held) the trustees can recover the entire loss. See generally *Heller* v. *Silverbranch Constr. Corp.,* 376 Mass. 621, 629 (1978); *Linthicum* v. *Archambault,* 379 Mass. at 388-389.

4. *Denial of Multiple Damages.*

The plaintiffs appeal with respect to the judge's denial of their claim for multiple damages under c. 93A, §§ 9 and 11. The argument is now based entirely on what the plaintiffs characterize as a bad faith response to the plaintiffs' demand letter.[7] Although that demand letter and the response thereto were attached to the complaint and admitted by the answer,

---

[7] This argument has no application to so much of the plaintiffs' claim as may be governed by c. 93A, § 11.

there is no reference in seven days of trial to a refusal to grant relief, and the judge made no finding concerning any refusal. In the absence (as here) of a request under Mass.R.Civ.P. 52(b), 365 Mass. 817 (1974), an additional finding on a contested matter will not be made in this court. *Building Inspector of Lancaster* v. *Sanderson,* 372 Mass. at 163-164. *Bourne* v. *Austin,* 19 Mass. App. Ct. 738, 742-743 (1985). This is simply a case in which the plaintiffs failed to prove anything more than negligence. Compare *Linthicum* v. *Archambault,* 379 Mass. at 388. Contrast *Shaw* v. *Rodman Ford Truck Center, Inc.,* 19 Mass. App. Ct. 709, 710-712 (1985).

The judgment is to be modified so as to include therein an attorney's fee for the plaintiffs in connection with this appeal in such reasonable amount as may be determined by the trial judge;[8] as so modified, the judgment is affirmed.

*So ordered.*

---

[8] *Patry* v. *Liberty Mobilehome Sales, Inc.,* 394 Mass. 270, 272 (1985).