In re LONE STAR INDUSTRIES INC., CONCRETE RAILROAD CROSS TIES LITIGATION.

LONE STAR INDUSTRIES, INC.; Lone Star Transportation Corp.; and San–Vel Concrete Corporation, Third–Party Plaintiffs,

v.

LAFARGE CORPORATION and Lafarge Canada, Inc., Third–Party Defendants.

LONE STAR INDUSTRIES, INC. and Lone Star Transportation Corp., Plaintiffs,

v.

LAFARGE CORPORATION and Lafarge Canada, Inc., Defendants.

MDL No. 827.
Civil Nos. H–89–2005, H–89–3085, H–89–3343, H–90–748 and H–90–1741.

United States District Court, D. Maryland.

April 3, 1995.

John J. Sheehy, John M. Quitmeyer, Guy C. Quinlan, James W. Paul and Rogers & Wells, New York City and Max H. Lauten and Kramon & Graham, Baltimore, MD, for plaintiffs and third-party plaintiffs Lone Star Industries, Inc., Lone Star Transp. Corp. and San–Vel Concrete Corp.

Lawrence T. Hoyle, Jr., Wayne W. Suojanen, Richard M. Bernstein and Hoyle, Morris & Kerr, Philadelphia, PA and Robert W. Powell and Smith, Somerville & Case, Baltimore, MD for defendants and third-party

defendants Lafarge Corp. and Lafarge Canada, Inc.

## OPINION

ALEXANDER HARVEY, II, Senior District Judge.

At the first trial held in the Fall of 1992 in this consolidated multi-district case, the jury returned a verdict in favor of plaintiffs and third-party plaintiffs Lone Star Industries, Inc., Lone Star Transportation Corp. and San–Vel Concrete Corp. (collectively "Lone Star") against defendants and third-party defendants Lafarge Corporation and Lafarge Canada, Inc. (collectively "Lafarge"). Damages in the amount of $1,213,000 were awarded to Lone Star.

The parties cross-appealed, and in an unpublished Opinion dated April 7, 1994, the United States Court of Appeals for the Fourth Circuit vacated this Court's judgment and remanded the case for a new trial on all issues relating to both liability and damages. *In Re: Lone Star Indus., Inc. Concrete Railroad Cross Ties Litigation,* 19 F.3d 1429 (4th Cir.1994) (table). In its Opinion, the Fourth Circuit, *inter alia,* granted Lone Star leave to amend the complaint and the third-party complaints and add a claim under the Massachusetts unfair trade practices statute, Mass. Ann.Laws ch. 93A, § 2 (Law. Co-op. 1991) ("the Chapter 93A claim"). (Slip op. at 20–22).

Lone Star's pleadings were accordingly amended, and this additional claim was included in the Joint Supplemental Amended Pretrial Order on Remand. At the second trial, the following claims of Lone Star were tried to the jury: (1) fraudulent misrepresentation; (2) breach of express warranty; (3) breach of implied warranty of merchantability; (4) breach of implied warranty of fitness for a particular purpose; (5) negligence; and (6) indemnification. Under Massachusetts law, there is no right to a trial by jury of an action brought under Chapter 93A. *Nei v. Burley,* 388 Mass. 307, 446 N.E.2d 674, 679 (1983); *Wallace Motor Sales, Inc. v. American Motor Sales Corp.,* 780 F.2d 1049, 1064 (1st Cir.1985). It was accordingly agreed that since the evidence to be presented at the trial in support of and in opposition to Lone

Star's Chapter 93A claim was substantially the same as that to be presented in support of Lone Star's other claims, the Chapter 93A claim would be tried before the Court at the same time that Lone Star's other claims were being tried before the jury.[1]

The second trial commenced on October 24, 1994 and lasted for almost six weeks. After deliberating over a period of some three days, the jury returned its verdict on November 30, 1994 by way of Written Interrogatories. The jury found for Lafarge on all of the claims of Lone Star presented to it except for Lone Star's claim of breach of express warranty. The jury found that plaintiff Lone Star had not proved that it was entitled to a recovery from defendant Lafarge (1) on its claim of fraudulent misrepresentation; (2) on its claim of breach of warranty of merchantability; (3) on its claim of breach of warranty of fitness for a particular purpose; (4) on its claim of negligence; and (5) on its claim of indemnification. The jury did find for Lone Star on its claim of breach of express warranty and determined that Lone Star was entitled to damages in the amount of $8,391,483.50 for amounts paid to the railroads and other entities in settling the lawsuits and other claims asserted against Lone Star. The jury further determined that Lone Star was not entitled to recover any damages (1) for litigation fees and expenses incurred in defending the lawsuits brought by the railroads; (2) for interest paid on such litigation fees and expenses; (3) for concrete tie-related asset write offs; (4) for lost profits; and (5) for future lost profits.

After the jury had returned its verdict on November 30, 1994, the Court discussed with counsel the entry of a partial judgment which would reflect the jury's verdict. Several questions remained, namely whether the applicable statute of limitations would reduce the amount of the jury's award and whether Lone Star was entitled to prejudgment interest on the amount awarded. Those issues were addressed by the parties in post-trial memoranda. In its Memorandum Opinion of December 20, 1994, this Court concluded that no part of the jury's award was barred by the applicable statute of limitations. The parties had agreed on the amount of prejudgment interest which should be included in the judgment if the Court entered partial judgment for Lone Star in the full amount of the jury's award. Pursuant to this ruling of the Court, partial judgment was entered on December 20, 1994 in favor of Lone Star against Lafarge in the amount of $8,391,483.50, plus prejudgment interest to that date in the amount of $916,573.75.

Anticipating that post-trial motions would be filed by the parties, the Court suggested and counsel agreed that final argument on Lone Star's Chapter 93A claim be heard at the same time that the Court heard argument on post-trial motions. A briefing schedule was accordingly set. Lone Star has now filed a motion for a new trial on damages. Lafarge in turn has filed a motion for judgment as a matter of law and to amend partial judgment. Insofar as the Chapter 93A claim is concerned, both sides have filed proposed findings of fact. Extensive memoranda have been submitted in support of and in opposition to Lone Star's Chapter 93A claim and in support of and in opposition to the pending motions. A hearing on the pending motions and on Lone Star's Chapter 93A claim has been held in open Court. The Court has had the benefit of reviewing the 7100 page transcript which was prepared during the trial of this case and has also reviewed pertinent exhibits.

After due consideration of the pending motions, the parties' memoranda, the trial transcript, the exhibits and counsel's oral arguments, the Court has concluded (1) that judgment should be entered in favor of Lafarge on Lone Star's Chapter 93A claim; (2) that Lone Star's motion for a new trial on damages should be denied; and (3) that Lafarge's motion for judgment as a matter of law and to amend the partial judgment should be denied.

I

*Lone Star's Chapter 93A Claim*

By its enactment of Chapter 93A, the Massachusetts Legislature permitted a party ag-

---

1. Out of the presence of the jury, there was presented to the Court a small amount of additional evidence, which related solely to Lone Star's Chapter 93A claim.

grieved by an unfair trade practice occurring within the State to file suit and recover damages,[2] equitable relief, attorneys' fees and costs. Lone Star's amended pleadings seek a recovery under §§ 2 and 11 of Chapter 93A.

Mass.Gen.L. ch. 93A, § 2 (1992) provides in pertinent part as follows:

(a) Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.

In 1972, § 11 was added to the statute, pertinent portions of which are as follows:

Any person who engages in the conduct of any trade or commerce and who suffers any loss of money or property, real or personal, as a result of the use or employment by another person who engages in any trade or commerce of an unfair method of competition or an unfair or deceptive act or practice declared unlawful by section two ... may ... bring an action ...

\* \* \* \* \* \*

If the court finds for the petitioner, recovery shall be in the amount of actual damages; or up to three, but not less than two, times such amount if the court finds that the use or employment of the method of competition or the act or practice was a willful or knowing violation of said section two.

\* \* \* \* \* \*

If the court finds in any action commenced hereunder, that there has been a violation of section two, the petitioner shall, in addition to other relief provided for by this section and irrespective of the amount in controversy, be awarded reasonable attorneys' fees and costs incurred in said action.

Mass.Gen.L. ch. 93A, § 11 (1992).

In support of its Chapter 93A claim, Lone Star has charged Lafarge with fraudulent misrepresentation, breach of express warranty, breach of warranty of merchantability, breach of warranty of fitness for a particular purpose, and negligence. In denying liability, Lafarge contends (1) that Lone Star's Chapter 93A claim should be dismissed be-cause the actions of Lafarge Canada, Inc. did not take place primarily and substantially in Massachusetts; (2) that § 11 was not intended by the Massachusetts Legislature to address commercial acts of the sort alleged by Lone Star; and (3) that in any event the evidence presented at the trial does not support a determination on the merits that Lafarge violated Chapter 93A.

(a)

*Jurisdiction*

The last paragraph of § 11 provides as follows:

No action shall be brought or maintained under this section unless the actions and transactions constituting the alleged unfair method of competition or the unfair or deceptive act or practice occurred primarily and substantially within the commonwealth. For the purposes of this Paragraph, the burden of proof shall be upon the person claiming that such transactions and actions did not occur primarily and substantially within the commonwealth.

Mass.Gen.L. ch. 93A, § 11.

According to Lafarge, the actions and transactions at issue here did not occur primarily and substantially within Massachusetts, inasmuch as the cement at issue was sold in Canada by Lafarge Canada to Lafarge Corporation and then transported by Lafarge Corporation from Canada to Massachusetts where it was sold to Lone Star. On the record here, this Court finds and concludes that Lafarge has not met its burden of showing that Lone Star may not bring suit under Chapter 93A based on the circumstances of this case.

■ In determining whether unfair or deceptive acts have occurred "primarily and substantially" in Massachusetts, a court must review the following three factors: (1) where the defendant committed the deceptive or unfair act or intended that it be relied on; (2) where the plaintiff received and acted upon the deceptive or unfair act; and (3) where the plaintiff incurred any losses due to the unfair or deceptive act. *Clinton Hosp. Ass'n. v. Corson Group, Inc.,* 907 F.2d 1260,

---

**2.** Damages are subject to doubling or trebling on   a finding of willfulness by the court.

1265–66 (1st Cir.1990). The significant or critical factor is the second one, namely where the plaintiff received and acted upon the unfair act. *Id.* A court should undertake "a pragmatic, functional analysis of the significant factors." *Id.* at 1266. The preponderance of the wrongful conduct must be examined in light of the "essential elements of the transaction." *Makino U.S.A., Inc. v. Metlife Capital Credit Corp.*, 25 Mass.App. Ct. 302, 518 N.E.2d 519, 524, *review denied,* 402 Mass. 1101, 521 N.E.2d 398 (1988).

■ When these principles are applied to the facts of record here, this Court concludes that Lafarge has not met its burden of showing that the acts in question did not occur primarily and substantially within Massachusetts. Although the cement was manufactured in Canada and the allegedly false mill certificates were issued there, Lafarge Canada intended that the cement and mill certificates be delivered to Lone Star in Massachusetts. Lone Star received and acted upon the allegedly false mill certificates in Massachusetts, and Massachusetts is the situs of Lone Star's losses. Any reliance by Lone Star on the mill certificates occurred in Massachusetts. Even were this Court to determine that the relevant acts were "evenly distributed" between Massachusetts and Canada, Lafarge would not then have met its burden of showing that the acts alleged did not occur primarily and substantially within Massachusetts. *See Greenray Indus., Inc. v. Charleswater Prods., Inc.*, 1990 W.L. 26887 at *3 (D.Mass.1990).

Accordingly, this Court concludes that it has jurisdiction to consider Lone Star's Chapter 93A claim.

(b)

*Acts Covered by Chapter 93A*

Lafarge next argues that Lone Star's allegations of fraud and breach of warranty do not constitute unfair or deceptive acts or practices under § 11 inasmuch as the commercial parties here were of equal bargaining power and possessed equal sophistication and business acumen. According to Lafarge, the conduct challenged here was not sufficiently egregious or oppressive to amount to a violation of Chapter 93A.

The statute does not contain a definition of the type of conduct which would constitute an "unfair or deceptive" act or practice. However, numerous reported decisions have addressed this question. It has been held that "[t]he objectionable conduct must attain a level of rascality that would raise an eyebrow of some one inured to the rough and tumble of the world of commerce." *Levings v. Forbes & Wallace, Inc.*, 8 Mass.App.Ct. 498, 396 N.E.2d 149, 153 (1979); *see also Quaker State Oil Refining Corp. v. Garrity Oil Co., Inc.*, 884 F.2d 1510, 1513 (1st Cir. 1989). A Chapter 93A claimant must show that the defendant's actions fell "within at least the penumbra of some common-law, statutory, or other established concept of unfairness" or were "immoral, unethical, oppressive, or unscrupulous," and resulted in "substantial injury … to competitors or other businessmen." *PMP Associates, Inc. v. Globe Newspaper Co.*, 366 Mass. 593, 321 N.E.2d 915, 917 (1975); *accord Pepsi–Cola Metro. Bottling Co., Inc. v. Checkers, Inc.*, 754 F.2d 10, 17–18 (1st Cir.1985); *Quaker State,* 884 F.2d at 1513; *Compagnie de Reassurance d'Ile de France v. New England Reinsurance Corp.*, 825 F.Supp. 370, 381 (D.Mass.1993).

■ A review of decisions of the Massachusetts courts addressing the reach of Chapter 93A indicates to this Court that Lone Star's allegations are indeed maintainable under Chapter 93A. It is true that a mere breach of contract, without more, does not constitute an "unfair or deceptive" practice in violation of Chapter 93A. *Whitinsville Plaza, Inc. v. Kotseas,* 378 Mass. 85, 390 N.E.2d 243, 251 (1979); *Marantz Co., Inc. v. Clarendon Indus., Inc.*, 670 F.Supp. 1068, 1074 (D.Mass.1987). It has further been held that a negligent act, standing by itself, does not amount to a violation of Chapter 93A. *Glickman v. Brown,* 21 Mass.App.Ct. 229, 486 N.E.2d 737, 741 (1985), *review denied,* 396 Mass. 1106, 488 N.E.2d 1179 (1986). However, it is well established that claims of fraudulent misrepresentation may be asserted under Massachusetts common law or under Chapter 93A. *Datacomm Interface, Inc. v. Computerworld, Inc.*, 396 Mass. 760, 489 N.E.2d 185, 197 (1986); *Nickerson v. Matco*

Tools Corp., 813 F.2d 529, 531 (1st Cir.1987); Bond Leather Co., Inc. v. Q.T. Shoe Mfg. Co., Inc., 764 F.2d 928, 937 (1st Cir.1985); Bio–Vita Ltd. v. Rausch, 759 F.Supp. 33, 36 (D.Mass.1991). Other decisions have recognized that claims of breach of express warranty and breach of implied warranty may be asserted under Chapter 93A. Linthicum v. Archambault, 379 Mass. 381, 398 N.E.2d 482, 487 (1979); Alcan Aluminum Corp. v. Carlton Aluminum of New England, Inc., 35 Mass.App.Ct. 161, 617 N.E.2d 1005, 1010, review denied, 416 Mass. 1105, 621 N.E.2d 685 (1993) (table); Jeffco Fibres, Inc. v. Dario Diesel Serv., Inc., 13 Mass.App.Ct. 1029, 433 N.E.2d 918 (1982).

■ The mere fact that the parties here were sophisticated business entities would not in itself bar a recovery by Lone Star under Chapter 93A. In a case in which business persons rather than commercial innocents are involved, a claimant may prevail by showing greater "rascality" than would a less sophisticated party. Anthony's Pier Four, Inc. v. HBC Associates, 411 Mass. 451, 583 N.E.2d 806, 822 (1991). In this case, Lone Star's allegations of wrongdoing by Lafarge meet the standard of an "unfair or deceptive act or practice," even taking into account that both parties to the transactions were sophisticated business people. Id.

Lafarge's reliance on Knapp Shoes, Inc. v. Sylvania Shoe Mfg. Corp., 418 Mass. 737, 640 N.E.2d 1101 (1994) is misplaced. In that case, the Supreme Judicial Court of Massachusetts held that a regulation issued by the State's Attorney General did not afford a basis for imposing liability in a § 11 case. The regulation in question provided that it was a violation of Chapter 93A for a party to fail to perform any promises or obligations arising under a warranty. However, the Court made it clear that its decision was not meant to suggest that the breach of a warranty occurring in a commercial context could never give rise to liability under Chapter 93A. Id. at 1105. The Court emphasized that when a breach of warranty is alleged to be an unfair or deceptive act, the question of liability must be resolved by reference to general principles of liability under § 11. Id.

Based on the decisions of the Massachusetts courts cited hereinabove, this Court concludes that the claims alleged by Lone Star in this case are maintainable under Chapter 93A. Whether or not the evidence presented at the trial would permit Lone Star to recover damages from Lafarge under Chapter 93A based on any of the theories advanced is quite another question. It is that primary issue which will be addressed hereunder.

(c)

*The Merits*

Lone Star's Chapter 93A claim was not tried before the jury, and it is the Court itself which must now resolve the disputed issues of fact as to that claim. The trial record here is a massive one. Extensive expert and other testimony was presented by the parties during the six week trial, and several hundred exhibits were admitted into evidence. Much of the evidence was conflicting, and in resolving disputed issues of fact, due regard has been given by the Court to the credibility of the witnesses and the weight their testimony deserves. Findings of fact and conclusions of law pursuant to Rule 52(a), F.R.Civ.P. are contained in this Opinion, whether or not expressly so stated.

■ Relying on Wallace Motor Sales, Lone Star contends that even though the jury did not find Lafarge liable for fraudulent misrepresentation, for negligence or for one or more breaches of implied warranties, this Court should find Lafarge liable under Chapter 93A on one or more of these grounds. In Wallace Motor Sales, the district court's findings on the Chapter 93A claims were the direct opposite of the jury's findings on the counts submitted to it. 780 F.2d at 1053. In its opinion on appeal, the First Circuit upheld the district court's determination of the Chapter 93A claims, even though that determination was contrary to the findings of the jury in the same case. In this case, this Court is not bound in any way by the several determinations made by the jury in favor of Lafarge nor by the one determination made by the jury in favor of Lone Star.

The principal argument advanced by Lafarge in defending Lone Star's Chapter 93A claim on the merits is that Lone Star has failed to prove causation. Indeed, Lafarge has even argued in its post trial motion that the Court should determine as a matter of law that the jury's finding in favor of Lone Star on its claim of breach of express warranty should be set aside because of Lone Star's failure to prove causation. That motion will be discussed hereinafter. Insofar as the Chapter 93A claim is concerned, the Court must determine whether Lone Star has met its burden of proving by a fair preponderance of the evidence that one or more of the breaches of duty allegedly owed by Lafarge to Lone Star was the cause of the loss and damage claimed.

In its charge to the jury on the issue of causation, the Court said the following:

Causation is therefore an indispensable element of all of Lone Star's claims against Lafarge. What you must determine is whether the injuries alleged by Lone Star were caused by Lafarge. To establish causation, Lone Star must prove the following: (1) causation in fact; and (2) proximate causation. First, a defendant's breach of a legal duty is a cause in fact of a plaintiff's harm if that harm would not have occurred "but-for" the breach. Second, in addition to this requirement of causation in fact, plaintiff Lone Star must establish that Lafarge's defective cement proximately caused Lone Star's injuries. A proximate cause of an injury is the cause which in a natural and continuous sequence produces an injury and without which the injury would not have occurred. An injury is proximately caused by an act or failure to act when it appears from the evidence in the case that the act or omission sets in motion a chain of events which brings about the injury, and other new and independent forces do not intervene to cause the injury.

Neither side objected to that instruction. The charge given by the Court to the jury was fashioned essentially from the First Circuit's Opinion in *Peckham v. Continental Cas. Ins. Co.*, 895 F.2d 830, 836 (1st Cir. 1990). As Circuit Judge Selya stated in that case, causation is "ordinarily" a fact question, and in a jury trial is an issue to be determined by the jury. *Id.* at 837. Of course, in a Chapter 93A case, the Court as the factfinder must resolve this fact question. In his Opinion, Judge Selya discussed the concept of causation as follows:

Causation is binary, comprising causation in fact and proximate (or "legal") causation. A defendant's breach of a legal duty is a cause in fact of the plaintiffs' harm if that harm would not have occurred "but for" the breach. Restatement (Second) of Torts § 432(1) (1965). Nevertheless, but-for causality is only half the battle. The second half is whether the breach proximately caused the harm, that is, whether the defendant should bear legal responsibility for the injury. What is more, the inquiry into proximate cause is independent of that into actual cause. *Swift v. United States*, 866 F.2d 507, 509 (1st Cir. 1989) (applying Massachusetts law). "The touchstone is foreseeability: [conduct results in] liability if, and to the extent that, a foreseeable risk of harm materializes." *Id.* at 510.

*Peckham*, 895 F.2d at 836.

Applying those principles here, this Court has concluded that Lone Star has failed to meet its burden of proving by a preponderance of the evidence that any of the alleged breaches of duty of Lafarge caused the loss and damage claimed.

■ The evidence presented at the trial indicates that the ties cracked for many reasons, principally because of poor production practices employed by Lone Star. In particular, the evidence discloses that Lone Star employed improper steam curing methods and used aggregate which resulted in an alkali-silica reaction in the cement.[3]

---

3. At the time, Lone Star was a poorly-managed company. During the period between 1983 and 1988, the Chief Executive Officer was one James Stewart. As a result of serious improprieties and misconduct, Stewart was later removed as Chief

Executive Officer and David Wallace assumed that position. At the trial, Wallace testified that the conduct of Stewart was so reprehensible that he was "not fit to lead anything," that Stewart was an "atrocious" leader, and that his conduct

That Lone Star's manufacturing process caused the distress in the ties at issue is initially indicated by the fact that similar problems did not arise in connection with Lafarge's sale of cement to others. During the years between 1983 and 1988, Lafarge sold large quantities of Type III cement to San–Vel and others for use in the manufacture of products other than concrete railroad ties. The evidence indicates that no complaints were received by Lafarge that any of these other concrete products were cracking. Only those concrete ties which were manufactured at Lone Star's San–Vel plant experienced cracking of the sort involved here.

A principal cause of the cracking in the ties was Lone Star's use of steam curing during the manufacturing process. Steam curing was a practice which in the early 1980's was disfavored by the railroad industry because of the difficulty of controlling the temperature of live steam during the process. It was known in the industry that improper steam curing caused delayed ettringite formation within the concrete which in time led to the cracking of railroad ties which had been manufactured in this manner.

On the issue of causation, the Court will credit in particular the testimony of Anthony Darroch. Darroch has been in the business of manufacturing concrete railroad ties in England for some 25 years. During his career, he has manufactured some 15 million concrete ties, the majority of which have been bought by British Rail, the nationalized railroad in England which operates the railroad system throughout Great Britain. Having even designed and built a factory in Birmingham, England, Darroch possessed considerable expertise in the design and manufacture of concrete railroad ties. He visited the San–Vel plant in Littleton, Massachusetts in December of 1991, and before testifying he reviewed a vast amount of information relating to the production and quality control methods employed at the plant. Darroch was not asked to give an ultimate opinion on the issue of causation. He testified, however, that production methods at the San–Vel plant created an environment which could lead to the cracking of the ties.

There were many deficiencies at the plant, the most serious of which involved Lone Star's method of steam curing concrete ties during the manufacturing process. By 1983, knowledgeable persons in the industry had recognized the problems of controlling live steam, had moved away from it and were using other curing methods. The Lone Star ties manufactured at the San–Vel plant were, however, steam-cured. Lone Star employed deficient methods of controlling temperature during the manufacturing process. Earlier, between 1978 and 1981, Lone Star had participated in a joint venture which manufactured approximately 1.1 million concrete railroad cross ties using Alpha Portland cement and naturally occurring gravel. No complaints were received by Lone Star regarding the durability of these joint venture ties. In the manufacture of those ties, an automatic control system supplied by Honeywell had been used to regulate the temperature during the cement-curing process. However, this method of achieving temperature control was not used at the San–Vel plant. Instead, Lone Star sought to control the temperature by means of monitoring by a night-steam man. According to Darroch, manual control of this sort constituted very bad practice. Moreover, in making critical temperature measurements, personnel at the San–Vel plant measured the ambient temperature rather than that of the concrete itself. The ambient temperature was at least 10 degrees cooler than the temperature of the concrete itself.

As disclosed by the evidence, it was critical to maintain proper temperatures during the curing process. According to Dr. Udo Ludwig, a renowned German expert who was a member of the investigative team assembled by Lone Star, temperatures in excess of 158 degrees Fahrenheit would result in delayed ettringite formation ("DEF"). One of the experts called by Lafarge was Dr. Hal Taylor, a retired university professor from Scotland who specializes in the chemistry of cement and concrete. Relying on Dr. Ludwig's work in the field, Taylor explained in some detail the chemical process whereby the

had a bad effect on company morale. In 1990,

Lone Star filed for bankruptcy protection.

heating of concrete above 158 degrees Fahrenheit would result in DEF.

William Hime, an expert called by Lone Star, conceded during cross-examination that the majority of the distress in the ties was caused by the steam-curing.[4] Dr. Mielenz, another expert called by Lone Star, wrote in his 1990 report to Dr. Carrasquillo that the "process of manufacture of the ties probably is a controlling factor in either process of deterioration, . . ." This was still his opinion when his deposition was taken in 1992. Mielenz further testified that every one of the Grade 4 and Grade 5 ties examined by him had been steam cured. Hime and Lone Star's witness Marusin likewise stated that they had seen no Grade 4 or Grade 5 ties which had not been steam cured.

Substantial and credible evidence presented at the trial indicates that a very high percentage of the concrete ties manufactured at the San–Vel plant were cured at temperatures in excess of 158 degrees Fahrenheit. Based on the testimony of Darroch and Taylor, as corroborated by other evidence in the case, the Court finds that Lone Star's improper steam curing practices were a primary cause of the cracking of the ties.

Another cause of the cracking of the ties was so-called alkali silica reaction ("ASR"), which resulted from Lone Star's use of reactive aggregates in the manufacture of the concrete ties. No petrographic testing had been done by Lone Star to determine that the aggregate used by it was not reactive. Lone Star's own experts recognized that ASR could have caused the ties at issue to crack. The testimony of Nails Thaulow will also be credited by the Court. Thaulow was a consulting engineer from Denmark who had specialized for some 27 years in analyzing failures of concrete materials and concrete structures and had done work for clients all around the world. In his studies of the chemical composition of concrete, he used both a petrographic microscope and a scanning electron microscope. Thaulow inspected and took core samples from Lone Star ties which had been removed from various tracks. He prepared thin sections and, by using his instruments, analyzed the composition of the concrete.[5] According to Thaulow, cracks in the ties which he examined were caused by alkali-silica reactivity which led to expansion and cracking of the aggregate. As he testified, it is well known in the industry that ASR can cause concrete to crack.

Lone Star's witness Mielenz testified that he found evidence of ASR in every tie which he examined. During his investigation, Mielenz noted that identification of ASR as a basic cause of the cracking problem was a "negative aspect" for Lone Star since Lone Star had approved the use of high alkali cement with their aggregates. Accordingly, the Lone Star team did not undertake to perform certain nonstandard tests, a failure termed by Mielenz to be a "grave error" in the prosecution of the investigation by Lone Star. When the tests were later performed by Lafarge, they demonstrated that the alkali aggregate combinations used at San–Vel were susceptible to deleterious ASR. Based on Thaulow's testimony, as supported by other evidence in the case, the Court finds that alkali-silica reactivity in the coarse aggregate used by Lone Star was also a primary cause of the cracking of the ties at issue.[6]

Lone Star presented the testimony of several experts who disagreed with the conclusions reached by Darroch and Thaulow. That testimony will not be credited by the Court. Dr. Ramon Carrasquillo, Lone Star's principal expert, was not a convincing witness. Carrasquillo was discursive and argumentative, particularly when challenged during cross examination. He did not begin his investigation of the cause of the cracking of the ties in an objective manner. When he was first engaged by Lone Star, he was told that his assignment was to "verify" that Lone

4. Other portions of Hime's testimony will not be credited by the Court.

5. Some 150 ties were cored. 700 thin sections were analyzed by use of an optical microscope, and 140 thin sections were analyzed by use of a scanning electron microscope.

6. Thaulow also observed ettringite in air pores found in the concrete and attributed this secondary ettringite formation to improper steam-curing of the ties.

Star was not negligent in its manufacturing practices. Carrasquillo was evasive in explaining the basis for his opinions and shifted his position several times. He, like Mielenz, initially believed that ASR was the sole or primary cause of distress in the ties. However, both Carrasquillo and Mielenz had changed their views when they testified at the trial.

In sum, this Court has concluded that Lone Star has not shown in this case that the loss and damage sustained by it would not have occurred "but-for" Lafarge's allegedly defective cement. Without regard to anything that Lafarge did or did not do, Lone Star's own conduct proximately caused the cracking of the ties manufactured by it. Judgment will therefore be entered in favor of Lafarge on Lone Star's Chapter 93A claim.[7]

## II

### Lone Star's Motion for a New Trial on Damages

In finding Lafarge liable for breach of express warranty, the jury awarded Lone Star damages in the amount of $8,391,483.50 for amounts paid to railroads and other entities in settling lawsuits and other claims asserted against Lone Star. In responding to Written Interrogatories, the jury specifically determined that Lone Star was not entitled to recover any damages (1) for litigation fees and expenses incurred in defending the lawsuits brought by the railroads; (2) for interest paid on such litigation fees and expenses; (3) for concrete tie-related asset write-offs; (4) for lost profits; and (5) for future lost profits.

Pursuant to Rule 59, F.R.Civ.P., Lone Star has now filed a motion for a new trial on

damages only. Asserting that the amount of the jury verdict was manifestly inadequate, Lone Star contends that there was no rational basis on which the jury could have awarded damages of only $8,391,483.50 for settlement amounts paid to the railroads or on which the jury could have awarded no damages at all for litigation expenses.[8]

In considering a motion for a new trial under Rule 59, a court should set aside the verdict if the trial judge finds that it is against the clear weight of the evidence, is based on false evidence or will result in a miscarriage of justice. *Poynter v. Ratcliff,* 874 F.2d 219, 223 (4th Cir.1989). In ruling on such a motion, a trial judge may weigh the evidence and consider the credibility of the witnesses. *Id.* Disposition of the motion lies within the sound discretion of the trial court. *Id.* Principles which guide the exercise of the Court's discretion in ordering a new trial on damages are similar to those applicable to any other motion for a new trial, whether the verdict is attacked for inadequacy or excessiveness. *Great Coastal Express, Inc. v. International Brotherhood of Teamsters,* 511 F.2d 839, 846 (4th Cir.1975), *cert. denied* 425 U.S. 975, 96 S.Ct. 2176, 48 L.Ed.2d 799 (1976). However, ordinarily, the amount of damages awarded at a trial is not reviewable by way of a motion for a new trial. *De Foe v. Duhl,* 286 F.2d 205, 207 (4th Cir.1961).

Lone Star's principal argument in support of its motion for a new trial on damages is that the jury necessarily found, when it determined that Lafarge had breached its express warranty, that Lafarge's breach caused substantial injury to Lone Star. In making this argument, Lone Star relies on that portion of the Court's charge to the jury which discussed causation insofar as that issue per-

---

7. In view of the Court's determination of the issue of causation, it is not necessary to review the record and make findings as to other aspects of Lone Star's Chapter 93A claim, including Lafarge's contention that the claim is barred by limitations. The Court would, however, agree with the jury findings that Lone Star did not prove (1) fraudulent misrepresentation; (2) breach of warranty of merchantability; (3) breach of warranty of fitness for a particular purpose and (4) negligence. A closer question, which need not be resolved here, is whether

evidence of Lafarge's alleged breach of express warranty would reach the "level of rascality" necessary for a recovery under Chapter 93A.

8. Lone Star is also seeking an award of interest paid on litigation fees and expenses. However, Lone Star has not contended in its motion that the jury could not under the evidence presented have decided to award no damages at all for concrete tie related asset write-offs, for lost profits and for future lost profits.

tained to Lafarge's alleged liability.[9] However, Lone Star overlooks the subsequent instruction which the Court gave to the jury and which pertained to the principles to be applied by the jury in its determination of the amount of damages to be awarded if it found for Lone Star as to liability. In its separate charge on damages, the Court instructed the jury as follows:

> If you decide upon a verdict in favor of plaintiff Lone Star against defendant Lafarge, then you should go on to determine the amount of damages to be awarded to plaintiff Lone Star. You are not to infer from the fact that an instruction on measure of damages is being given that the Court is instructing you to award damages in [this] case.

> The burden is upon plaintiff Lone Star to prove by a fair preponderance of the evidence satisfactory to you each and every element of damages which such plaintiff alleges was sustained as a direct and proximate consequence of the breach of duty asserted against defendant Lafarge. As to any claim of damages involved in this case, if you believe that an item of damages claimed either was not sustained, *or if sustained was not a proximate consequence of a breach of duty of defendant Lafarge,* then you must not award damages for such item. In awarding damages, *you are not to engage in conjecture or speculation or assess damages for any losses not proven to your satisfaction to have resulted from the breach of a duty owed by defendant Lafarge to plaintiff Lone Star.* Damages are awarded to an injured party in order to place that party as nearly as possible in the situation it would have occupied had the wrong not been committed. (Emphasis added).

Counsel for Lone Star asked the jury to award damages of $67,000,000 for settlement amounts paid to the railroads and damages of $16,000,000 for litigation expenses. The jury was instructed that if it found for plaintiff Lone Star on any one of its claims, it should consider, *inter alia,* the following categories of damages sought by Lone Star:

> (1) Settlement costs paid to resolve the lawsuits brought against Lone Star by each of the Railroads and other entities. In considering this item of damages, you must determine whether the amount for which Lone Star settled its liability to the Railroads was reasonable under all the circumstances. If you do not determine that the total amount was reasonable, then you should go on to determine what total amount would in fact have been a reasonable settlement under the circumstances. In deciding this question, you may consider whether there was the potential that Lone Star would have been found liable if the Railroads had gone to trial on their claims, the likelihood of complex and protracted litigation with the Railroads, the extent to which the settlements were the product of arms-length bargaining, and the potential award of damages to which Lone Star would have been exposed if the Railroads had gone to trial on their claims.
> (2) Litigation fees and expenses incurred in connection with the lawsuits instituted by the Railroads and other entities against Lone Star.

■ On the evidence presented, the jury could have found that only a small percentage of the Lafarge cement was defective and that Lafarge breached its express warranty only as to that portion of the cement. It could then have reasoned that only a similar small proportion of the damages claimed for settlement amounts paid was attributable to Lafarge's breach. Under the Court's instructions and the evidence presented, the jury could have believed that a very large part of the amounts paid in settlement was not a proximate consequence of Lafarge's breach of duty. After hearing evidence of Lone Star's poor production practices, the jury could rationally have concluded that Lone Star rather than Lafarge should bear the major part of the settlement costs. Furthermore, the jury was not required to treat Lone Star's separate settlement with each of the railroads in the same manner.[10] It could

---

9. That portion of the charge is set forth hereinabove, *supra,* at page 489 of this Opinion.

10. Lone Star so argued in its "Memorandum Concerning the Court's Treatment of the Jury's

have decided to award damages for ties delivered to some of the railroads but not for ties delivered to others.

Moreover, the jury was entitled to disregard evidence presented by Lone Star and conclude that Lone Star had not proved that Amtrak and the other railroads necessarily had to remove all of the ties at once rather than only that small proportion which were severely cracked. Some railroads began removing all of the ties immediately, even though many of them were showing only a negligible amount of cracking. Others, like CSX, removed only the Grade 4 and Grade 5 ties when the cracking was first discovered. Later, when Lone Star itself expressed concern as to the longevity of the ties, CSX replaced all of them. Based on the evidence before it, the jury could have determined that Lone Star was entitled to recover from Lafarge only that portion of the settlement costs represented by the Grade 4 and Grade 5 ties.

As noted, the jury was instructed that if it did not find that the amounts paid by Lone Star in settling its liability to the railroads were reasonable, it should then go on to determine the total amount which would have been a reasonable settlement under all the circumstances. The jury did just that. In defending the railroads' claims in the suits brought against it, Lone Star advanced various affirmative defenses. The jury was instructed that, in determining the reasonability of the settlements, they could consider Lone Star's potential liability and the potential award of damages which would be made against Lone Star had the cases gone to trial. The jury could very well have concluded that had these suits gone to trial, many of Lone Star's defenses would have substantially diminished the damages which Lone Star would have been required to pay.[11]

Lone Star argues that the damage figure reached by the jury was not supported by either its experts or by Lafarge's experts and that uncontradicted evidence supports a much higher award than that made by the jury. However, the jury had a right to reject the expert opinions presented at the trial "even if not directly contradicted." *Quinones–Pacheco v. American Airlines, Inc.,* 979 F.2d 1, 5 (1st Cir.1992); *see also Gregg v. U.S. Indus., Inc.,* 887 F.2d 1462, 1469–70 (11th Cir.1989).

Once it concluded that a reasonable amount which Lone Star should have paid to the railroads in settlement was $8,391,483.50, the jury had every right to go on and determine that Lone Star was entitled to no recovery at all for litigation fees and expenses incurred in defending the various lawsuits. Having decided that some $8 million would have been a reasonable settlement, the jury presumably concluded that the remaining $59 million of Lone Star's claim had not been reasonably paid and was therefore the sole responsibility of Lone Star. Based on evidence of Lone Star's vigorous defense of the railroad lawsuits, the jury could have rationally concluded that all of the legal services and costs incurred in defending the railroads' suits and in settling the railroads' claims would have been required in any event. Accordingly, the jury could properly have reasoned that Lone Star would have incurred all of these litigation fees and expenses whether or not there was a breach of duty on the part of Lafarge.

The parties here advance various conjectural bases for the award of damages made by the jury in this case. But it is not possible to determine with any degree of certainty how and why the jury reached the figure it did. There is no legally cognizable mechanism for inquiring into the heads of jurors to determine their basis in awarding damages. *Midwest Precision Services, Inc. v. PTM Indus. Corp.,* 887 F.2d 1128, 1140 (1st Cir. 1989). What is apparent is that there was abundant expert and other evidence before the jury relating to the issue of damages in this case. The verdict here "is not so shockingly low in light of the conflicts in the testimony to lead to the conclusion that it

Damages Verdict," filed on December 12, 1994 (at pp. 4–6).

**11.** The jury could also have found that Lone Star failed to mitigate damages. In its charge, the Court instructed the jury that plaintiff Lone Star had a duty to exercise reasonable care and diligence to avoid loss and to minimize its damages.

was based upon passion or prejudice or some misconception of the facts or of the law." *De Foe*, 286 F.2d at 207.

On the record here, this Court concludes that the jury could have rationally reached the decision it did and that the amount of damages awarded was not manifestly inadequate. Lone Star's motion for a new trial on damages will therefore be denied.

### III

*Lafarge's Motion for Judgment As A Matter of Law and To Amend the Partial Judgment*

Lafarge has moved for judgment as a matter of law pursuant to Rule 50(b), F.R.Civ.P. Somewhat different principles are applicable to a motion filed under Rule 50(b) from those which pertain to a motion filed under Rule 59(a).

■ The standard for granting a motion for judgment as a matter of law filed under Rule 50(b) after the jury has returned its verdict is the same as the standard for granting such a motion at the close of all the evidence. Such a motion was formerly known as a motion for judgment notwithstanding the verdict, and a number of Fourth Circuit opinions have discussed the principles to be applied. *See Hawkins v. Sims*, 137 F.2d 66, 67 (4th Cir.1943). In ruling on a motion for a directed verdict and similarly on a motion for judgment as a matter of law, the trial court must consider the record as a whole, viewing the evidence in the light most favorable to the party against whom the motion is made and giving that party the benefit of all reasonable inferences which arise from the evidence. If there is substantial evidence upon which a jury could reasonably find a verdict for the nonmoving party, the motion should be denied. *Wilhelm v. Blue Bell, Inc.*, 773 F.2d 1429, 1433 (4th Cir.1985), *cert. denied*, 475 U.S. 1016, 106 S.Ct. 1199, 89 L.Ed.2d 313 (1986); *Mays v. Pioneer Lumber Corp.*, 502 F.2d 106, 107 (4th Cir.1974), *cert. denied*, 420 U.S. 927, 95 S.Ct. 1125, 43 L.Ed.2d 398 (1975); *Ralston Purina Co. v. Edmunds*, 241 F.2d 164, 167 (4th Cir.), *cert. denied*, 353 U.S. 974, 77 S.Ct. 1059, 1 L.Ed.2d 1136 (1957). The movant is not entitled to prevail if, based on the applicable law, the evidence presented at trial raises questions upon which reasonable minds may differ. *See Harner v. John McShain, Inc.*, 394 F.2d 480, 481 (4th Cir.1968).

When these principles are applied here, this Court concludes that Lafarge's pending motion for judgment as a matter of law must be denied. Based on its instructions to the jury in this case and the testimony and exhibits, this Court has concluded that sufficient evidence was presented at the trial to support in all respects the jury's verdict in favor of Lone Star.

■ Lafarge argues that Lone Star has failed to prove causation. According to Lafarge, defective cement could not as a matter of law have been a "but-for" cause of any losses sustained by Lone Star because ties made with Lone Star cement were also cracking and because any amount of cracking at all would have caused the railroads to have removed all of the ties. There is no merit to this contention. As discussed hereinabove, the jury was entitled to conclude that there was no need for Amtrak and the other railroads to remove all of the ties rather than merely the small proportion which were severely cracked. Evidence was presented indicating that a large percentage of ties made with Lone Star cement were in good condition. The jury could therefore have concluded that the existence of this small number of defective Lone Star ties would not have caused the railroads to remove all of the ties. That there was some cracking in a concrete tie did not mean that the tie was unfit for service. There was evidence before the jury that ties which were graded 1, 2 and 3 were still fit for service even though cracked.

As discussed hereinabove, the Court, in ruling on Lone Star's Chapter 93A claim, has determined that Lone Star did not meet its burden of proving that the loss and damage sustained by it would not have occurred "but-for" Lafarge's allegedly defective cement. This determination was made by the Court as the factfinder and not as a matter of law. In view of the conflicting evidence, the jury could reasonably have reached a result different from that of the Court on the issue of

causation. Although the Court did not do so, the jury had the right to give full credit to the expert testimony presented by Lone Star. Similarly, the jury could have given little or no weight to the testimony of Lafarge's experts. Once the opinion of a qualified expert is admitted in evidence, the causation issue is for the trier of fact. *Crinkley v. Holiday Inns, Inc.*, 844 F.2d 156, 164 n. 2 (4th Cir.1988). It was "for the jury to decide which of the experts was more credible, which used the more reliable data, and whose opinion—if any—the jury would accept." *Lust v. Clark Equipment Co., Inc.*, 792 F.2d 436, 439 (4th Cir.1986), quoting *Grenada Steel Indus., Inc. v. Alabama Oxygen Co.*, 695 F.2d 883, 889 (5th Cir.1983). Although the Court would disagree with the jury's determination of the issue of causation, there was evidence in the record upon which the jury could reasonably have found a verdict for Lone Star on its breach of express warranty claim. Accordingly, Lafarge's motion for judgment as a matter of law will be denied.

Lafarge has also moved to amend the partial judgment entered by the Court in favor of Lone Star in the amount of $9,308,057.25, a figure which includes prejudgment interest. According to Lafarge, the applicable statute of limitations would reduce the jury award to $3,143,732.94, inclusive of prejudgment interest.

The precise issue presented by Lafarge's post-trial motion was discussed at some length in the Court's eight page Memorandum Opinion of December 20, 1994. Lafarge's motion to amend the partial judgment amounts essentially to a motion for reconsideration of that ruling. After considering the further arguments which have been presented, the Court will reaffirm its ruling of December 20, 1994.

As a result of the Court's rulings made during the trial concerning the applicability of limitations to Lone Star's warranty claims, the parties agreed that if the jury found in favor of Lone Star on one of its warranty claims and awarded the total amount claimed by Lone Star for sums paid to the railroads in settlement, namely some $67 million, then the portion barred by limitations would re-

duce the amount of the recovery to some $22 million. In that event, the jury would necessarily have determined that all of the cement furnished by Lafarge had been included in all of the defective ties manufactured by Lone Star. The reduction could then be made mathematically, merely by applying an agreed percentage figure. However, there was no similar agreement that an award of less than $22 million would similarly be reduced mathematically. On the contrary, the Court suggested, and counsel agreed, that in the latter event the issue would be briefed, and the Court would then decide, after the jury had returned its verdict, whether an award of less than $22 million would be subject to further reduction because of limitations. When the jury returned a verdict of some $8 million, it was therefore necessary for the Court to rule on the issue. Briefs were submitted by the parties, and the Court concluded in its Memorandum Opinion of December 20, 1994 that there should be no reduction of the jury verdict on the ground of limitations.

Lafarge now concedes that it has the burden of proving that portion of Lone Star's damages which would be attributable to shipments of cement barred by the applicable statute of limitations. The Court is satisfied that Lafarge did not meet its burden of showing what portion of the jury's award was barred by the four-year statute of limitations. There was substantial evidence in the record which would support the view that all of the cement considered by the jury in making its award was tendered by Lafarge within the four-year limitations period. Although it cannot be determined whether it was the pre–1985 cement or the post–1985 cement which caused the railroads to remove the ties, Lafarge concededly had the burden of proof in this regard, and Lafarge has not been able to show what portion of the damages awarded by the jury was based on ties manufactured outside of the four-year period.

Under the circumstances, it was not appropriate, as argued by Lafarge, for the Court to mathematically apply to the $8 million figure the same percentage figure which the parties had agreed upon for reducing a possible $67 million award. Accordingly, La-

farge's motion to amend the partial judgment will be denied.

## IV

*Conclusion*

For all the reasons stated, judgment will be entered in favor of Lafarge on Lone Star's Chapter 93A claim. Lone Star's motion for a new trial on damages will be denied, and Lafarge's motion for judgment as a matter of law and to amend the partial judgment previously entered by the Court will also be denied. Since Lone Star has prevailed on some issues and Lafarge has prevailed on others, the parties on each side shall bear their own costs. An appropriate Final Judgment Order will be entered by the Court.